703 S.E.2d 561

**Michael J. O'DELL, Plaintiff Below, Appellee,**

v.

**Robert and Virginia STEGALL Defendants Below, Appellants,**

and

**Sidney Seibert, Clifford E. and Mary Belle Starliper, and Donald E. and Patricia Walker, Defendants Below.**

**No. 35488.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 2010.

Decided Nov. 24, 2010.

596

598

William Francis Xavier Becker, Esq., Rockville, MD, for Appellee.

Braun A. Hamstead, Esq., Richard A. Sussman, Esq., Hamstead & Associates, L.C., Martinsburg, WV, for Appellants.

KETCHUM, Justice:

Two-and-a-half centuries ago, in the days of Thomas Fairfax and John Savage, the doctrine of prescriptive easements took root in our common law. When estates were so large that the boundaries were unknown, and vast tracts were owned by individuals who never set foot on the land, it was reasonable and economical for the law to reward a diligent user of the land with an easement by prescription at the expense of the absentee owner.

In 1719, Lord Fairfax inherited a grant of 5.28 million acres of land in what is now northern Virginia and eastern West Virginia (including what is now Jefferson county). However, Lord Fairfax never set foot on his land until around 1735, and—since the territory had never been mapped when the grant by the British Crown was made—the western boundary was not established until 1746. In 1772, Captain Savage received a grant from the British Crown of 28,600 acres of land along the Ohio and Big Sandy Rivers (for himself and some of his soldiers, in what is now Cabell and Wayne counties); Captain Savage never set foot on the property. "Squatters" and trespassers on both grants were common. The litigation over the use and ownership of the land contained within these two grants was extensive and, in some cases, legendary.[1]

But in today's world, our law on the doctrine of prescriptive easements is a tangled mass of weeds. The doctrine essentially rewards a trespasser, and grants the trespasser the right to use another's land without compensation. Such a significant imposition on the rights of modern landowners discourages neighborly conduct, and does not square with the modern ideal that we live in a congested but sophisticated, peaceful society.

In this appeal from the Circuit Court of Jefferson County, we are asked to examine a jury's verdict finding that a plaintiff had acquired a prescriptive easement to use a gravel lane. The jury's verdict also awarded the plaintiff damages against his neighbors, largely on the finding that the neighbors had indecorously interfered with the plaintiff's prescriptive easement. The circuit court entered judgment on the jury's verdict in favor of the plaintiff.

After careful consideration of our morass of case law, we now take this opportunity to clarify the common law doctrine of prescriptive easements. We endeavor to eliminate archaic and contradictory terms, and establish terms and definitions that are understandable to the modern factfinder. We also seek to indelibly imprint in our common law a fundamental policy consideration: easements by prescription are absolutely not to be favored.

After a thorough examination of the record, we believe that the plaintiff wholly failed to establish that he had a prescriptive easement, and failed to prove his other causes of action seeking damages. Accordingly, we reverse the circuit court's order entering judgment for the plaintiff on the jury's verdict.

I.

*Facts and Background*

In 2006, plaintiff (and appellee) Michael J. O'Dell bought land and a home on the Old Leetown Pike—now Route 15—in Jefferson County, West Virginia. The plaintiff's home was originally built and used as the German Baptist Brethren Church starting sometime around 1898, and was converted into a residence sometime after 1999. The plaintiff's lot abuts the Leetown Pike/Route 15, and the plaintiff has a driveway that connects directly to this public road.

---

1. *See, e.g., Fairfax's Devisee v. Hunter's Lessee,* 11 U.S. 603, 7 Cranch 603, 3 L.Ed. 453 (1812) (permitting a British native, pursuant to the peace treaty of 1783 between the United States and Great Britain, to inherit Lord Fairfax's land after his death); *Martin v. Hunter's Lessee,* 14 U.S. 304, 1 Wheat. 304, 4 L.Ed. 97 (1816) (establishing that the U.S. Supreme Court has ultimate authority over state courts in matters of federal law); *Maryland v. West Virginia,* 225 U.S. 1, 32 S.Ct. 672, 56 L.Ed. 955 (1912) (defining the border of West Virginia and Maryland in relation to the 1746 Fairfax Stone at the head of the North Branch of the Potomac River); *Commonwealth v. Hite,* 33 Va. 588, 6 Leigh 588 (1835) (action by the State to recover land in the Savage Grant from trespasser); *Porter v. Staley,* 99 W.Va. 91, 127 S.E. 911 (1925) (action by one landowner to eject trespasser from tract originating in the Savage Grant).

Directly behind and adjacent to the plaintiff's property, defendants (and appellants) Robert and Virginia Stegall own land and a home. The defendants' property is "landlocked" and surrounded on all sides by land owned by other individuals.

This case concerns a private, 25–foot–wide gravel lane that borders on the northern edges of both the defendants' property and the plaintiff's property. The defendants do not own the gravel lane, but it is their only access to a public highway (the Leetown Pike/Route 15).

The central question is whether the plaintiff has a legal right to use the gravel lane for ingress to and egress from the *north* side of his home. The plaintiff already has access to the Leetown Pike/Route 15 by way of his own driveway across his property on the *south* side of his home. The plaintiff does not know who owns the land beneath the gravel lane, but he insists that he has a prescriptive easement to use the lane as an additional access to his property from the Leetown Pike. The defendants retort that the plaintiff does not have a prescriptive easement, and assert that the plaintiff's use will cause wear and tear to the gravel lane which the defendants are contractually obligated to repair.

At the outset, we note that we have struggled to understand the parties' rights to access and use the gravel lane. This case demonstrates that there is nothing more vicious than a fight over a piece of land between two neighbors. The parties' briefs and the record from the trial court reveal more ridiculing than reasoning, more finger-pointing than fact-finding. For instance, the plaintiff has repeatedly asserted that he has a prescriptive easement to use the gravel lane, yet the plaintiff's own expert testified at trial that the plaintiff did not have a prescriptive easement. Likewise, the defendants have repeatedly asserted that they have an express easement to use the gravel lane, yet all the documentation in the record undermines that assertion. And throughout the case, neither party seems to have made any effort to identify the actual owner of the real estate upon which the gravel lane sits.

Setting aside the parties' vigorous assertions, as best we can ascertain, this is the historical underpinning of the parties' rights to access the gravel lane.

### A. *History of the Gravel Lane*

In 1890, Isaac Strider acquired a 23–acre tract of land along the Leetown Pike. Beginning in 1893, Mr. Strider divided parts of the tract into numerous smaller residential lots for sale. Four of these lots, which now border the gravel lane at issue, were created between 1893 and 1911. Mr. Strider kept the remainder of the 23–acre tract, which also borders on the gravel lane.

The four lots created by Mr. Strider are related to one another in a roughly square pattern: two lots (one of which is now the plaintiff's) border the Leetown Pike/Route 15, a public highway; the other two lots (one of which is now the defendants') are situated behind the first two, and—but for the 25–foot–wide gravel lane at issue in this case—would be landlocked. The gravel lane at issue extends eastward from the Pike and separates the two northern lots from the two southern lots. The plaintiff owns the southern lot bordering the Leetown Pike; the defendants own the southern lot that is landlocked. As best we can discern from the record, Mr. Strider retained all of the land to the east of the four lots, and he used the gravel lane as one way to access the remainder of his 23–acre tract from the Leetown Pike. (See Figure 1.) [ATTACHED IN SEPARATE DOCUMENT]

*Figure 1, showing the orientation of plaintiff Michael O'Dell's property and the property of defendants Robert and Virginia Stegall to the gravel lane, marked here as the "25' Lane to Public Road".*

The first of the four lots, conveyed in 1893, is about 1½ acres in size, borders the Leetown Pike and now borders the north side of the gravel lane. The 1893 deed from Mr. Strider makes no mention of the gravel lane. The current owners of the lot, Clifford E. and Mary Belle Starliper, have lived on the lot for over 50 years and claim no ownership interest or other right in the gravel lane.

The second of the four lots (about ½ acre in size) was conveyed by Mr. Strider in 1898, borders the Leetown Pike/Route 15, and borders the south side of the gravel lane. The 1898 deed makes no mention of the gravel lane. Although the lot is now owned by plaintiff O'Dell, as previously mentioned the lot was originally used by the German Baptist Brethren Church.[2] The trial testimony suggested that in the decades before 1999, churchgoers used the gravel lane at least twice a week to access a parking lot at the rear of the church. This testimony did not reveal if the use was with the permission of the owner of the gravel lane, or whether churchgoers were trespassing.

The gravel lane at issue is first mentioned in an 1899 deed by Mr. Strider conveying the

**2.** The record indicates that in 1908, at the German Baptist Brethren Church Annual Conference in Des Moines, Iowa, the church changed its name by resolution to the Church of the Brethren.

third of the four lots. The third lot (about ½ acre in size) is located on the north edge of the gravel lane, and is landlocked behind the lot owned by the Starlipers. The third lot is now owned by Sidney Seibert. The plat in the 1899 deed shows a 25–foot–wide way marked as a "road" or "driveway" owned by "I.H. Strider" extending eastward from the Leetown Pike, passing adjacent to the first and third lots, and extending beyond to a tract of land marked as being owned by "I.H. Strider." In the deed, Mr. Strider conveyed to the buyer of the third lot and "her heirs and assigns forever" "the right to use the road for ingress and egress 25 ft. wide running from the said lot through the land of I.H. Strider to the Leetown & Charles Town road[.]"

Mr. Strider conveyed the fourth lot—the southern landlocked lot which is now owned by the defendants—in 1911. The plat with the 1911 deed shows that the fourth lot (about ½ acre in size) borders on the gravel lane, which is labeled in the plat as a "lane to public road." While the deed apparently contains no wording creating an explicit right for the owner of the lot to use the gravel lane,[3] it appears that since 1911 all of the owners of the defendants' lot have used the gravel lane to access the Leetown Pike.

In 1988, three parties with property bordering the gravel lane (the prior owners of the defendants' landlocked lot; the prior owners of Ms. Seibert's landlocked lot; and the owners of the remainder of the 23–acre tract formerly owned by Mr. Strider) signed a "road maintenance agreement" that was recorded with the county clerk. The plaintiff's predecessor, the German Baptist Brethren Church, did not sign the 1988 agreement. The road maintenance agreement notes that the three parties were the owners of "parcels of real estate that are made accessible to [the Leetown Pike/]Route 15 by a right of way 25

feet in width[.]" The parties agreed, "for themselves, their heirs and assigns," that they would "maintain the road surface of the 25 foot wide road and right of way in its present state of repair by sharing equally the cost of maintenance and repairs." As the current owners of one of the landlocked lots, the defendants agree that they are bound by the 1988 road maintenance agreement.

Donald and Patricia Walker (who appear to now own the remainder of the 23 acres formerly owned by Mr. Strider) admit that over the years, they used the gravel lane as a means of access to their land from the Leetown Pike with construction equipment and vehicles. At some point in 2006, the Walkers subdivided the remainder of the 23–acre tract, constructed another road for access, and represented to the county planning commission that they would no longer allow access to their land by way of the gravel lane.[4] After the instant lawsuit was filed in 2008, the Walkers stopped using the gravel lane.

### B. The Lawsuit to Establish a Prescriptive Easement

In 2008, numerous disagreements arose between plaintiff O'Dell and the defendant Stegalls. Essentially, the plaintiff claimed that he had the right to use the gravel lane to access a horseshoe-shaped driveway on the northern edge of his land. This horseshoe-shaped driveway appears to have been partially constructed and connected to the gravel lane sometime after 1999. The defendants objected to the plaintiff's use of the gravel lane to access the horseshoe-shaped driveway, called the police two times, and threatened to have the plaintiff prosecuted for trespassing. The defendants also took several photographs of the plaintiff driving on the gravel lane, and tape-recorded a conversation that they had with the plaintiff

---

3. Our understanding of this deed comes from a report by the plaintiff's expert; neither the plaintiff nor the defendants saw fit to introduce the 1911 deed into the record.

As we discuss later in the opinion, while the defendants do not have an explicit, written easement to use the gravel lane to access their property, the record supports the conclusion that the defendants' have an easement implied by both necessity and by prior use. See Cobb v. Daugherty, 225 W.Va. 435, 693 S.E.2d 800 (2010) (defining easements implied by necessity, and easements implied by a prior use of the land).

4. County ordinances require roads accessing new subdivisions to be at least 50 feet wide. The Walkers stopped using the gravel lane because it is only 25 feet wide, and could not be expanded to handle passing cars, a shoulder, drainage and maintenance. Before approving the new subdivision, the county planning commission required the Walkers to prohibit future use of the gravel lane to access the subdivided tract. The final plat of the Walkers' subdivision, recorded in the county clerk's office in 2007, states that "no access ... within this subdivision is permitted through the unnamed private right of way[.]"

about his use of the lane, while the plaintiff and one of the defendants were standing on the lane.

In response to the defendants' objections, plaintiff Michael O'Dell filed the instant lawsuit in September 2008 against all of his neighbors who border the gravel lane. In counter-clockwise fashion as their properties related to the plaintiff's home, the plaintiff brought suit: (1) against the defendants, Robert and Virginia Stegall, who own the landlocked parcel behind plaintiff O'Dell's home; (2) against Donald and Patricia Walker, the owners of what appears to be the remainder of Isaac Strider's 23–acre tract that is at the end of the gravel lane; (3) against Sidney Seibert, the owner of the 1898 outparcel that is landlocked behind the Starlipers' lot, and the only person who has an express easement to use the gravel lane; and (4) against Clifford and Mary Belle Starliper, the owners of the 1893 outparcel that borders the Leetown Pike.

The primary count in the plaintiff's complaint sought to "quiet title by way of a prescriptive easement" allowing the plaintiff to use the gravel lane. The plaintiff claimed that the gravel lane had, "by its nature and duration of its open, continuous, notorious and adverse use, as to any owner of the parcel" become a "community driveway servicing as an ingress and egress easement" to the plaintiff's property.

However, the plaintiff's complaint also sought damages from defendants Donald and Virginia Stegall for "intentionally, deliberately and maliciously" interfering with the plaintiff's alleged prescriptive easement. Two other counts in the complaint sought compensatory and punitive damages for abuse of process and the tort of outrage, largely because the defendants had called the police on two occasions and alleged that the plaintiff was trespassing by using the gravel lane. Finally, an amended complaint by the plaintiff alleged that the defendant Stegalls should be liable for compensatory and punitive damages because they had civilly conspired to take pictures of the plaintiff when he used the gravel lane, and to tape record a conversation between one of the defendants and the plaintiff while standing on the gravel lane.

Before trial, the plaintiff settled his claims against the Walkers, Ms. Seibert, and the Starlipers. The Walkers entered into a settlement agreement on April 23, 2009 with the plaintiff, in which the Walkers claimed that they had "no interest in the unnamed lane referred to in Plaintiff's Complaint."[5] Ms. Seibert settled and gave the plaintiff a purported "quitclaim deed of easement" in which she waived any objection to the plaintiff's use of the gravel lane, and agreed that the plaintiff would have an "easement and right-of-way over and across" the portion of the gravel lane that bordered the plaintiff's property, "for purposes of ingress to and egress from [plaintiff's] real estate and the public road[.]"[6] Ms. Seibert's quitclaim deed did not convey title to any land or to the lane, or convey her express easement. Finally, the Starlipers said that they had no interest

---

5. Specifically, the settlement agreement between the plaintiff and the Walkers stated:

Defendants Walkers agree and state for themselves, and their heirs, successors in interest, and assigns, that they and their successors in itnerests [sic] and assigns, have no interest in the unnamed lane referred to in Plaintiff's Complaint. Defendants Walkers also agree that they shall not in the future enter upon or use the unnamed lane. Plaintiff reserves the right to use all legal means to enforce this promise should Defendants violate this promise....

Plaintiff and Defendants Walkers agree that they have ... settled all rights and claims they may have against one another arising from the facts and circumstances pled or referred to herein, whether expressly pled and set forth herein or not.

6. The "quitclaim deed of easement" between Ms. Seibert and the plaintiff states in part:

NOW THEREFORE THIS QUITCLAIM DEED OF EASEMENT WITNESSETH, that for value received the party of the first part [Ms. Seibert], for herself and her heirs, successor and assigns, hereby grants and conveys, without any warranty whatsoever, unto the party of the second part [plaintiff O'Dell], and his heirs, successors and assigns, an easement and right-of-way over and across that portion of the 25 foot road right-of-way and easement which is contiguous to and adjoins [the plaintiff's] property ... for purposes of ingress to and egress from [the plaintiff's] real estate and the public road, which shall run with and be appurtenant to the land owned by the [plaintiff.]

whatsoever in the lane, and the plaintiff consented to their dismissal from the lawsuit. The circuit court dismissed all of the plaintiff's claims against the Walkers, Ms. Seibert, and the Starlipers with prejudice, and those parties are not part of the instant appeal.

A jury trial against the defendant Stegalls was held in June 2009, wherein the plaintiff asserted that he had a prescriptive easement to use the gravel lane. To support this assertion, he introduced the testimony of several individuals who stated that there used to be a parking lot behind the church that now serves as the plaintiff's home. These individuals said that, for several decades prior to 1999, visitors to the church had continuously used the gravel lane to access the parking lot.

The plaintiff also offered the expert testimony of Fred Gates, a land surveyor, to help establish the plaintiff's legal right to use the gravel lane. When asked about what facts established a prescriptive easement, Mr. Gates said, "I am not sure this is a prescriptive easement." Instead, Mr. Gates speculated that the plaintiff had a right to use the gravel lane merely because "[i]t appears that back in the 1890s Mr. Strider created a series of lots around a right of way that [was] intended to serve them."

After a three-day trial, on June 11, 2009, the jury concluded that the plaintiff had established a prescriptive easement to use the gravel lane as an "ordinary access to his residence." The jury also awarded the plaintiff $5,300.00 in compensatory damages and $4,700.00 in punitive damages against the defendant Stegalls for: (1) intentionally interfering with the plaintiff's right of ingress and egress; (2) committing the intentional tort of outrage "by virtue of threats of trespass prosecution and calls to law enforcement . . . and/or recording [plaintiff] O'Dell's conversations;" (3) civil conspiracy; and (4) invasion of privacy. The jury ruled in favor of the defendants on one count, finding that they had not engaged in abuse of process.

The circuit court denied the defendants' numerous motions for post-trial relief. The defendants now appeal the circuit court's judgment entered on the jury's verdict, and refusal to set aside the judgment.

## II.

### Standard of Review

We are asked to review the circuit court's order denying a post-verdict motion for judgment as a matter of law. The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial is *de novo*. Syllabus Point 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009). Our standard for reviewing such an order was stated in Syllabus Point 2 of *Fredeking v. Tyler*, where we said:

> When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

This Court has historically favored supporting jury verdicts and will affirm a verdict, unless there clearly is insufficient evidence to support the verdict. For instance, in Syllabus Point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983) we said that:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

We now turn to the arguments of the parties.

## III.

### Discussion

The defendants, Robert and Virginia Stegall, assert on appeal that the jury's verdict is wrong for a host of different reasons, but their central argument boils down to this: the plaintiff failed to prove he had a prescriptive easement to use the gravel lane to access his property. They therefore assert that the jury had no basis to award damages against the defendants. After carefully reviewing the trial record, we agree.

To understand why, we begin with a primer to clear up the morass that is our case law on the doctrine of prescriptive easements.

### A.

### The Law of Prescriptive Easements

■■ "An easement is a right that one person has to use the land of another person, for a specific purpose." *Cobb v. Daugherty*, 225 W.Va. 435, 441, 693 S.E.2d 800, 806 (2010). "The land benefitting from an easement is called the *dominant estate;* the land burdened by an easement is called the *servient estate.*" *Newman v. Michel*, 224 W.Va. 735, 740–41, 688 S.E.2d 610, 615–16 (2009).

The general rule (with several exceptions not important to the instant case) is that an easement can be created in three ways: by prescription—the easement equivalent of adverse possession; by an express grant or reservation; or ... by implication from the particular set of facts and circumstances.

*Cobb*, 225 W.Va. at 441, 693 S.E.2d at 806 (quotations and footnotes omitted).

■■ A prescriptive easement arises through the adverse use of another person's land. "There is a similarity between the elements which must be shown to establish a prescriptive easement and those necessary for adverse possession." *Veach v. Day*, 172

W.Va. 276, 278, 304 S.E.2d 860, 863 (1983) (*per curiam* ). The main distinction between adverse possession and a prescriptive easement "is that an adverse possession claimant occupies or possesses the disputed land, whereas one seeking a prescriptive easement makes some easement-like limited use of the disputed land." *Newman v. Michel*, 224 W.Va. at 743, 688 S.E.2d at 618.[7]

"Prescriptive easements are based on the notion that if one uses the property of another for a certain period without permission and the owner fails to prevent such use, the prolonged usage should be treated as conclusive evidence that the use is by right." Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land*, § 5:1 (2010).

Prescription doctrine rewards the long-time user of property and penalizes the property owner who sleeps on his or her rights. In its positive aspect, the rationale for prescription is that it rewards the person who has made productive use of the land, it fulfills expectations fostered by long use, and it conforms titles to actual use of the property. The doctrine protects the expectations of purchasers and creditors who act on the basis of the apparent ownerships suggested by the actual uses of the land.

*Restatement (Third) of Property (Servitudes)*, § 2.17, cmt. c. "[I]ts underlying philosophy is basically that land use has historically been favored over disuse, and that therefore he who uses land is preferred in the law to he who does not, even though the latter is the rightful owner." *Finley v. Yuba County Water Dist.*, 99 Cal.App.3d 691, 696, 160 Cal.Rptr. 423, 427 (3d.Dist.1979). The doctrine of prescriptive easements "reflect[s] the philosophy that established patterns of land possession and use should be protected and that a diligent occupant should be re-

---

7. Syllabus Point 3 of *Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. 84, 232 S.E.2d 524 (1977) requires that, before one may establish ownership by adverse possession, he must show:

(1) That he has held the tract adversely or hostilely; (2) That the possession has been actual; (3) That it has been open and notorious (sometimes stated in the cases as visible and notorious); (4) That possession has been exclusive; (5) That possession has been continuous; (6) That possession has been under claim of title or color of title.

warded at the expense of a careless owner." Bruce & Ely, *The Law of Easements and Licenses in Land,* § 5.1.[8]

In West Virginia, the case that firmly established the fundamental elements of the prescriptive easement doctrine is *Town of Paden City v. Felton,* 136 W.Va. 127, 66 S.E.2d 280 (1951).[9] In Syllabus Point 1 of

---

**8.** Professors Bruce and Ely suggest that, in this modern era, "[t]he related concepts of adverse possession and prescriptive easements have been called into question." *Id.* The reason is because the concepts do not "always square[ ] with modern ideals in a sophisticated, congested, peaceful society." *Finley v. Yuba County Water Dist.,* 99 Cal.App.3d 691, 697, 160 Cal.Rptr. 423, 427 (3d.Dist.1979). The prescriptive easement doctrine "discourages neighborly conduct and accommodation. Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription. Prescription tends to increase the costs of land ownership by creating a need for periodic monitoring to detect adverse uses." *Restatement (Third) of Property (Servitudes),* § 2.17, cmt. c.

Hence, there have been some calls to abolish the doctrines of adverse possession and easement by prescription. *See, e.g.,* Michael V. Hernandez, "Restating Implied, Prescriptive, and Statutory Easements," 40 Real.Prop., Prob. & Tr. J. 75, 105–109 (2005) (prescriptive easements "serve[ ] no legitimate independent function and should be abolished" because "awarding a permanent property right to a willful trespasser hardly preserves the peace, and the law of prescription actually breeds litigation by forcing the landowner to sue a trespasser before the statutory period runs."); William G. Ackerman and Shane T. Johnson, "Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession," 31 Land & Water L.Rev. 79, 80 (1996) ("[T]he public policy supporting [the usage of prescription and adverse possession] has long since gone the way of the cattle drive and the chuckwagon.... [T]hey represent a significant imposition on landowner rights ... [and] reward[ ] the theft of land.").

Because this radical departure from our existing law has not been addressed by the parties, we decline to consider such a dramatic change to our law.

**9.** Many cases prior to 1951 alluded to the various elements of the prescriptive easement doctrine, but *Town of Paden City* was the first case to assemble all of the elements together into one, cohesive rule. *See* John W. Fisher, II, "A Survey of the Law of Easements in West Virginia," 112 W.Va.L.Rev. 637, 677 (2010) ("[T]here were a number of prescriptive easement cases decided in the first half of the twentieth century. The decisions resolved the dispute between the litigants without an extended discussion of the various elements required to establish prescriptive easements."). *See, e.g.,* Syllabus Point 2, *Crosier v. Brown,* 66 W.Va. 273, 66 S.E. 326 (1909) ("To establish an easement of private way over land by prescription the use must be continuous and uninterrupted for the necessary period, under a *bona fide* claim of right, adverse to the owner of the land, and with his knowledge and silence. If the use is by his permission, or if he opposes and denies the right, title to the easement does not come by such use."); Syllabus Points 1 and 2, *Staggers v. Hines,* 87 W.Va. 65, 104 S.E. 768 (1920) ("1. Open, continuous, and notorious use by an owner of land, of a private way over an adjoining tract of land owned by another person, known, acquiesced in, unobjected to, and unprotested by the latter, is presumptively adverse to him, and enjoyed under a *bona fide* claim of right. 2. Such use for the period prescribed by the statute limiting rights of action for the recovery of land, in the absence of proof of circumstances altering its character, ripens into perfect title by prescription to an easement over the adjoining land."); Syllabus Points 1 and 2, *Foreman v. Greenburg,* 88 W.Va. 376, 106 S.E. 876 (1921) ("1. Open, continuous, and notorious use by an owner of land of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to, and unprotested by the latter, is presumptively adverse to him and enjoyed under a bona fide claim of right, even though the way is used jointly by both owners as a common outlet from their properties. 2. Such use for a period of ten years, in the absence of proof of circumstances altering its character, ripens into perfect title to an easement over the adjoining land by prescription."); Syllabus Points 1 and 2, *Hall v. Backus,* 92 W.Va. 155, 114 S.E. 449 (1922) (same); Syllabus Point 2, *Linger v. Watson,* 108 W.Va. 180, 150 S.E. 525 (1929) ("To establish an easement by prescription there must be: First, continued and uninterrupted use or enjoyment; second, identity of the thing enjoyed; and, third, a claim of right adverse to the owner of the soil, known to and acquiesced in by him. If the use is by the owner's permission, or if he opposes and denies the right, title to the easement does not come by such use."); Syllabus Point 2, *Post v. Wallace,* 119 W.Va. 132, 192 S.E. 112 (1937) ("The open, continuous, and uninterrupted use of a road over the land of another, under *bona fide* claim of right, and without objection from the owner, for a period of ten years, creates in the user of such road a right by prescription to the continued use thereof."); Syllabus, *Derifield v. Maynard,* 126 W.Va. 750, 30 S.E.2d 10 (1944) ("A private right of way over land, by prescription can only be acquired by uninterrupted user by a person who asserts such right, or by his predecessor in title to land to which such right is appurtenant, for a period of ten years or more, under claim of right, and without objection from the owner of the servient estate. User of such way by others does not inure to the benefit of an owner who has not, or his predecessors in title have not, used the

*Town of Paden City,* we stated the following rule:

> To establish an easement by prescription there must be continued and uninterrupted use or enjoyment for at least ten years, identity of the thing enjoyed, and a claim of right adverse to the owner of the land, known to and acquiesced in by him; but if the use is by permission of the owner, an easement is not created by such use.

Stated another way,

> As to an easement by prescription, the requisites for its acquisition are continued and uninterrupted, open and visible, use of a definite right in the land of another which is identical to that claimed as an easement and has a relation to the use of, and a direct and apparent connection with, the dominant tenement under an adverse claim of right, for the prescriptive period of time.

*Town of Paden City,* 136 W.Va. at 137, 66 S.E.2d at 286. In West Virginia, the prescriptive period of time—ten years—derives from the statute of limitation for property disputes, *W.Va.Code,* 55-2-1 [1923] ("No person shall make an entry on, or bring an action to recover, any land, but within ten years next after the time at which the right to make such entry or to bring such action shall have first accrued to himself or to some person through whom he claims.").

Professors Bruce and Ely state the prescriptive easement doctrine this way:

> [G]enerally a person claiming [a prescriptive] easement must show the following: adverse, open and notorious, continuous and uninterrupted use of another's land for the period of prescription.

*The Law of Easements and Licenses in Land,* § 5.2 (footnotes omitted). *See also, Restatement (First) of Property,* § 457 ("An easement is created by such use of land, for the period of prescription, as would be privileged if an easement existed, provided the use is (a) adverse, and (b) for the period of prescription, continuous and uninterrupted.").[10]

Our examination of our prior cases applying the doctrine of prescriptive easements reveals a lack of any clear enunciation of the meanings of the concepts underlying the doctrine. "The range and redundancy of terms and requirements reflect the diversity of theories that have contributed to the making of American prescription doctrine." *Restatement (Third) of Property (Servitudes),* § 2.17, cmt. g. Justice Miller once said that while it seems it is a "mere truism" to say that the "doctrine of adverse possession is firmly established in our law," in fact "when one attempts an orderly assessment of the doctrine through the cases, it is at best an arduous task." *Somon v. Murphy Fabrication & Erection Co.,* 160 W.Va. 84, 89, 232 S.E.2d 524, 528 (1977). In *Somon,* Justice Miller attempted to refine and clearly establish the meaning of the concepts underlying the doctrine of adverse possession.

Like the Court in *Somon,* we will now attempt to set out definitions of the elements necessary to establish a prescriptive easement, definitions intended to guide a finder of fact. We recognize, however, that these definitions "are at best fragile guidelines to outline in a general way the elements of [prescriptive easements], which in the main cannot be naturally compartmentalized in a

---

same for the period necessary to create a prescriptive right to the continued use thereof, except where the user by others is accompanied by a public claim thereto as a public highway, and the expenditure of public moneys or labor thereon.")

**10.** The *Restatement (Third) of Property (Servitudes)* has the following definitions of a prescriptive easement:

> § 2.16 Servitudes Created By Prescription: Prescriptive Use
> A prescriptive use of land that meets the requirements set forth in § 2.17 creates a servitude. A prescriptive use is ... a use that is adverse to the owner of the land or the interest

in land against which the servitude is claimed[.]

> § 2.17 Servitudes Created By Prescription: Requirements
> A servitude is created by a prescriptive use of land, as that term is defined in § 2.16, if the prescriptive use is:
> (1) open or notorious, and
> (2) continued without effective interruption for the prescriptive period.
> Periods of prescriptive use may be tacked together to make up the prescriptive period if there is a transfer between the prescriptive users of either the inchoate servitude or the estate benefited by the inchoate servitude.

given case. They serve only as a beginning point[.]" 160 W.Va. at 92, 232 S.E.2d at 529.

### (1) Elements of the Prescriptive Easement Doctrine

 To begin, after carefully considering the doctrine of prescriptive easements, we believe that the better expression of the doctrine is this: a person claiming a prescriptive easement must prove each of the following elements: (1) the adverse use of another's land; (2) that the adverse use was continuous and uninterrupted for at least ten years; (3) that the adverse use was actually known to the owner of the land, or so open, notorious and visible that a reasonable owner of the land would have noticed the use; and (4) the reasonably identified starting point, ending point, line, and width of the land that was adversely used, and the manner or purpose for which the land was adversely used.

### (2) Burden of Proof

 The degree of proof necessary to establish a prescriptive easement is clear and convincing evidence. As we said in Syllabus Point 2 of *Beckley Nat. Exchange Bank v. Lilly*, 116 W.Va. 608, 182 S.E. 767 (1935):

> In order to establish a right of way by prescription, all of the elements of prescriptive use, including the fact that the use relied upon is adverse, must appear by clear and convincing proof.

See also, Syllabus Point 1 of *Berkeley Development Corp. v. Hutzler*, 159 W.Va. 844, 229 S.E.2d 732 (1976) ("The burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof."); Syllabus Point 1, *Fanti v. Welsh*, 152 W.Va. 233, 161 S.E.2d 501 (1968) ("A landowner who asserts the right to an easement by prescription over the land of another must establish such right by clear and convincing proof."); Ely & Bruce, *The Law of Easements and Licenses in Land*, § 5:3 ("[T]he burden of proving the existence of a prescriptive easement rests on the claimant, and doubt will be resolved in favor of the landowner."). " '[C]lear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996), citing *Wheeling Dollar Sav. & Trust Co. v. Singer*, 162 W.Va. 502, 510, 250 S.E.2d 369, 374 (1978). " 'Clear and convincing evidence' or 'clear, cogent and convincing evidence' is the highest possible standard of civil proof[.] ... It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cramer v. West Virginia Dept. of Highways*, 180 W.Va. 97, 99 n. 1, 375 S.E.2d 568, 570 n. 1 (1988) (*per curiam* ).[11]

 Prescriptive easements are not

---

11. *See also, Coleman v. Anne Arundel County Police Dept.*, 369 Md. 108, 797 A.2d 770 (2002) (*quoting Maryland Pattern Jury Instructions* 1:8 (3rd ed.2000)) ("To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and 'convincing' in the sense that it is so reasonable and persuasive as to cause you to believe it."); *Maxwell v. Carl Bierbaum, Inc.*, 48 Ark.App. 159, 161, 893 S.W.2d 346, 348 (1995) ("Clear and convincing evidence has been defined as proof so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction, without hesitation, of the matter asserted; it is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established."); *State v. Turrentine*, 152 Ariz. 61, 68, 730 P.2d 238, 245 (Ariz.App.1986) ("Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the issue sought to

be proved. It is intermediate, being more than a mere preponderance of evidence, but not to the extent of such certainty as required with proof beyond a reasonable doubt."); *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (the party with the burden of persuasion may prevail only if he can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable.' "); *Slomowitz v. Walker*, 429 So.2d 797, 800 (Fla.Ct.App.1983) ("[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.").

favored in the law.[12] "It is axiomatic that easements by prescription are not favored in law because they necessarily work losses or forfeitures of the rights of others." *Zimmerman v. Newport*, 416 P.2d 622, 629 (Okl. 1966). "In this important matter, of subjecting, without pay, one man's land for the use of another, we must remember that the claimant carries the burden of proof, and he must show a use as of right, a hostile, adversary use, clearly show it." *Crosier v. Brown*, 66 W.Va. at 277, 66 S.E. at 328. "Each ... element[ ] ... must be established as a necessary, independent, ultimate fact, the burden of showing which is on the party asserting the prescriptive title, and the failure to find any one of such elements [is] fatal ..., for such failure to find is construed as a finding against it." *Carnahan v. Moriah Property Owners Ass'n, Inc.*, 716 N.E.2d 437, 441–42 (Ind.1999), *quoting Monarch Real Estate Co. v. Frye*, 77 Ind.App. 119, 124–25, 133 N.E. 156, 158 (1921). "The absence of any one or all of such requisites will defeat a claim of a right to an easement by prescription." *Fanti v. Welsh*, 152 W.Va. at 236, 161 S.E.2d at 503.

■ Accordingly, we hold that a person claiming a prescriptive easement must establish each element of prescriptive use as a necessary and independent fact by clear and convincing evidence, and the failure to establish any one element is fatal to the claim.

We now turn to the definitions of the four elements that a person claiming a prescriptive easement is required to establish.

### (3) "Adverse Use" of Another's Land Defined

■ A person claiming a prescriptive easement must first show that his or her use of the servient estate was "adverse" to the rights of the true owner. Without the requirement of adversity, "licenses would grow into grants of the fee, and permissive occupations of land become conveyances of it. 'It would shock that sense of right,' Chief Justice Marshall said ... 'if a possession which was permissive and entirely consistent with the title of another should silently bar that title.'" *District of Columbia v. Robinson*, 180 U.S. 92, 100, 21 S.Ct. 283, 45 L.Ed. 440 (1901), *quoting Kirk v. Smith ex dem Penn*, 22 U.S. 241, 9 Wheat. 241, 288, 6 L.Ed. 81 (1824).

But what does "adverse" truly mean? "'Adverse use' is a complex concept[.]"[13] Our cases discussing prescriptive easements have lobbed around the words "adverse" and "hostile," but have never attempted to posit a forthright definition to guide a finder of fact.[14] Many of our early cases are tarnished with a "residue of terminology that often

**12.** *See, e.g., Brick House Cafe & Pub, L.L.C. v. Callahan*, 151 S.W.3d 838, 841 (Mo.App.W.D. 2004) ("The law does not favor the creation of prescriptive easements."); *Carnahan v. Moriah Property Owners Ass'n, Inc.*, 716 N.E.2d 437, 441 (Ind.1999) ("Prescriptive easements are not favored in the law."); *Pedersen v. Washington State Dept. of Transp.*, 43 Wash.App. 413, 417, 717 P.2d 773, 776 (1986) ("prescriptive rights are not favored in law"); *Kuhlmann v. Platte Valley Irr. Dist.*, 166 Neb. 493, 512, 89 N.W.2d 768, 780 (1958) ("A prescriptive right is not looked on with favor by the law."); *Eagle Lodge, Inc. v. Hofmeyer*, 193 Va. 864, 877, 71 S.E.2d 195, 202 (1952) ("[I]t may be said that the law is jealous of a claim to an easement, and the burden is on the party asserting such a claim to prove its elements clearly.").

**13.** 4 *Powell on Real Property* § 34.10[2][a] [Michael Allan Wolf ed., 2010].

**14.** The best definition of "adverse" we can locate in our jurisprudence can be found, not in a case on prescriptive easements, but in our seminal case on adverse possession.

[F]or the element of "hostile" or "adverse" possession, the person claiming adverse possession must show that his possession of the property was against the right of the true owner and is inconsistent with the title of the true owner. The word "hostile" is synonymous with the word "adverse" and need not and does not import that the disseisor must show ill will or malevolence to the true owner.

*Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. at 90, 232 S.E.2d at 528.

In *Crosier v. Brown*, 66 W.Va. at 276–77, 66 S.E. at 328, we quoted, without specifically adopting, the following varied definitions for "adverse use":

Adverse use has been variously defined as use under a claim of right known to the owner of the servient tenement; use whenever desired without permission asked or objection made; use such as the owner of an easement would make of it, without permission asked or given, and disregarding entirely the claims of the owner of the land; and use under a claim of right inconsistent with or contrary to the interest of the other party, and of such a character that it is difficult or impossible to account for it except on the presumption of a grant.

confuses modern analysis." Fisher, "A Survey of the Law of Easements in West Virginia," 112 W.Va.L.Rev. at 675.[15] This problem is not unique to West Virginia. As a Utah court said over six decades ago, "[t]he courts are not in accord as to the exact meaning of 'adverse use' when applied to prescriptive easements," and great confusion "exists as a result of the courts' unfortunate choice of words in characterizing the use necessary to initiate a prescriptive right." *Zollinger v. Frank*, 110 Utah 514, 516–17, 175 P.2d 714, 715 (1946).[16]

Moreover, instead of defining "adverse use," in many of our early cases this Court simply presumed that a claimant's use of another's property was adverse, if the claimant had otherwise proven the remaining elements of the prescriptive easement doctrine. In doing so, the Court shifted the burden of proof from the claimant to the landowner, who had to prove that the servient estate *had not* been used adversely (*e.g.*, the land had been used with permission).[17] Stated another way, while this Court has said the burden of proof is upon the *claimant* of a prescrip-

**15.** As an example, Dean Fisher notes that the Court's early cases on prescription were influenced by the fictional concept of the "lost grant." *Id.* at 673–675. The concept, derived from the English common law, holds that if a person used another's land for 20 years, then it was presumed that a grant authorizing the use had been made, but the grant itself had been lost. *See, e.g., Rogerson v. Shepherd*, 33 W.Va. 307, 315, 10 S.E. 632, 635 (1889) ("[I]f there has been the use of an easement for twenty years, unexplained, it will be presumed to be under a claim of right, and adverse, and be sufficient to establish a title by prescription, and to authorize the presumption of a grant, unless contradicted or explained[.]"); *Wooldridge v. Coughlin*, 46 W.Va. 345, 348, 33 S.E. 233, 235 (1899) ("Prescription presumes, as defined at common law, that a grant was once made far back in time. In the past the length of time of user of the easement must have been so long that evidence of its commencement has become lost in its lapse. It must have been from a time 'whereof the memory of man runneth not to the contrary.'").

**16.** In *Zollinger*, the Utah court quoted from Sir William Searle Holdsworth's 17–volume *History of English Law*, where he too found great confusion as to the meaning of "adverse use" in the context of prescriptive easements:

It would, I think, be true to say that there is no branch of English law which is in a more unsatisfactory state. There are, indeed, other branches of English law which stand in need of an intelligent restatement; but no mere restatement can clear up the muddle which the courts and the Legislature have combined to make of the law of prescription.

*Zollinger v. Frank*, 110 Utah at 516–17, 175 P.2d at 715.

**17.** This shifted burden of proof appeared repeatedly in our cases in the first half of the twentieth century. *See* Syllabus Point 1, *Holland v. Flanagan*, 139 W.Va. 884, 81 S.E.2d 908 (1954) ("The open, continuous and uninterrupted use of a road over the lands of another, under *bona fide* claim of right, and without objection from the owner, for a period of ten years, creates in the user of such road a right by prescription to the continued use thereof. In the absence of any

one or all of such requisites, the claimant of a private way does not acquire such way by prescription over the lands of another."); *Town of Paden City v. Felton*, 136 W.Va. at 139–40, 66 S.E.2d at 288 ("This Court has frequently decided that the open, continuous and uninterrupted use of a private way by one landowner over the land of another person for a period of ten years or more, with the knowledge of such other person, is presumptive evidence of the claim of right to an easement and of the adverse character of the use, and that the presumption will be deemed to be conclusive, unless it is shown that the use was permissive or that the owner of the land so used protested and objected to such use."); Syllabus Point 2, *Post v. Wallace*, 119 W.Va. 132, 192 S.E. 112 (1937) ("The open, continuous, and uninterrupted use of a road over the land of another, under *bona fide* claim of right, and without objection from the owner, for a period of ten years, creates in the user of such road a right by prescription to the continued use thereof."); Syllabus Point 1, *Hall v. Backus*, 92 W.Va. 155, 114 S.E. 449 (1922) ("Open, continuous, and notorious use by an owner of land, of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to, and unprotested by the latter, is presumptively adverse to him and enjoyed under a *bona fide* claim of right."); Syllabus Point 1, *Foreman v. Greenburg*, 88 W.Va. 376, 106 S.E. 876 (1921) ("Open, continuous, and notorious use by an owner of land of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to, and unprotested by the latter, is presumptively adverse to him and enjoyed under a bona fide claim of right, even though the way is used jointly by both owners as a common outlet from their properties."); Syllabus Point 1, *Staggers v. Hines*, 87 W.Va. 65, 104 S.E. 768 (1920) (same); Syllabus Point 2, *Roberts v. Ward*, 85 W.Va. 474, 102 S.E. 96 (1920) ("Open, continuous, and notorious use by an owner of land, of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to, and unprotested by the latter, is presumptively adverse to him, and enjoyed under a *bona fide* claim of right."); Syllabus Point 2, *Hawkins v. Conner*, 75 W.Va. 220, 83 S.E. 982 (1914)

tive easement to prove adverse use of another's land for ten years (by clear and convincing evidence, no less), at the same time we have also said that it is the *landowner* who bears the burden of proving that the claimant's use *was not* adverse,[18] if the claimant merely showed ten years of continuous use of the land. This Court has never—until this case—addressed or attempted to explain this incongruity in our law.

 The term "adverse use" does not imply that the person claiming a prescriptive easement has animosity, personal hostility, or ill will toward the landowner; the uncommunicated mental state of the person is irrelevant. Instead, adverse use is measured by the observable actions and statements of the person claiming a prescriptive easement and the owner of the land.[19] *Kellison v. McIsaac*, 131 N.H. 675, 680, 559 A.2d 834, 837 (1989) (subjective intent of adverse claimant

does not determine validity of prescriptive claim); *Dunbar v. Heinrich*, 95 Wash.2d 20, 27, 622 P.2d 812, 816 (1980) ("[A]dversity is to be measured by an objective standard; that is, by the objectively observable acts of the user and the rightful owner."); *Bills v. Nunno*, 4 Mass.App.Ct. 279, 284 346 N.E.2d 718, 723 (1976) (" 'Adverseness' is found in the actual use made of the way by the claimant of the easement: the claimant's uncommunicated mental state is immaterial.").

 "Adverse use" generally means the "use of property as the owner himself would exercise, entirely disregarding the claims of others, asking permission from no one[.]" *Malnati v. Ramstead*, 50 Wash.2d 105, 108, 309 P.2d 754 (1957). Use of a servient estate is adverse "when a party ... has received no permission from the owner of the soil, and uses the way as the owner would

("Continuous and uninterrupted use of a private way for ten years or more, with knowledge of the owner of the land, is presumptive evidence of claim of right to the easement and of the adverse character of the use; and the presumption will be deemed conclusive, unless it is shown that the use was permissive or that the owner protested and objected thereto."); Syllabus Point 1, *Mitchell v. Bowman*, 74 W.Va. 498, 82 S.E. 330 (1914) ("One who for ten years or more continuously travels a defined way over the lands of another, with the knowledge of the owner, but without the owner's permission, interruption, or denial of the use, acquires the way by prescription."); Syllabus Points 1 and 2, *Walton v. Knight*, 62 W.Va. 223, 58 S.E. 1025 (1907) ("A private right of way by prescription may be acquired over another's land by visible, continuous, and uninterrupted use thereof for ten years, under a *bona fide* claim of right, with the acquiescence of the owner.... Such use is presumed to be with the knowledge and acquiescence of the owner and to *prima facie* give the right; which presumption will be conclusive, unless accompanied by the protest and objection of the owner under such circumstances as to repel it."); Syllabus Point 2, *Wooldridge v. Coughlin*, 46 W.Va. 345, 33 S.E. 233 (1899) ("Use of a private way from one's land over land of another for ten years with the acquiescence of that other will confer a right to such way, but, if the landowner does not acquiesce therein, but denies the right of way, such use will not confer the right of way."); Syllabus Point 3, *Boyd v. Woolwine*, 40 W.Va. 282, 21 S.E. 1020 (1895) ("A private right of way by prescription may be acquired by a visible, continuous, uninterrupted use for twenty years under a *bona fide* claim of right."); Syllabus, in part, *Rogerson v. Shepherd*, 33 W.Va. 307, 10 S.E. 632 ("[I]f there has been an open and public use of an easement for more

than twenty years, unexplained, it will be presumed to be under a claim of right, and adverse[.]")

18. Our cases have not made clear what degree of proof the landowner was required to produce to rebut the claimant's evidence, whether it was clear and convincing proof, a preponderance, or merely a prima facia case.

19. In the context of the doctrine of adverse possession, Justice Miller made the following observation about the choice of an "objective" test for adversity that is based entirely on the actions of the parties:

It is, perhaps, sufficient to comment briefly on the two major and opposite views that have evolved in this area. One advances a subjective test; the other an objective one. Those courts that follow the subjective test reason that the element of hostile and adverse connotes a mental intent and therefore if one entertains a belief that he holds the disputed area by virtue of his title document, he does not possess it with the requisite adverse or hostile intent. The other view looks on the physical acts and concludes that if physical dominion has been exercised over the disputed area, this is sufficient to satisfy the adverse or hostile element. As Holmes, C.J., stated in *Bond v. O'Gara*, 177 Mass. 139, 58 N.E. 275 (1900), "His claim is not limited by his belief." We favor this latter theory.

The reasons for such selection may be at best arbitrary, but it does appear that proof is more certain if limited to objective evidence.

*Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. at 95, 232 S.E.2d at 531.

use it, disregarding his claims entirely, using it as though he owned the property himself." *Blanchard v. Moulton,* 63 Me. 434, 437 (1873).

■ Our examination of authoritative texts, treatises, Dean Fisher's authoritative article on easements in West Virginia [20], and cases from other jurisdictions indicates that an "adverse use" of land is, at its root, one that is *against* the rights of the landowner as distinguished from one that is *under* the rights of the landowner. "Hostile use of real property by an occupant or user . . . imports that the claimant is possessing or using it as owner, in contradistinction to possessing or using the real property in recognition of or subordinate to the title of the true owner." *Malnati v. Ramstead,* 50 Wash.2d at 108, 309 P.2d at 756. A claimant is adversely using another's land when he "assert[s] an independent and individual right in himself to use the way and . . . the right to do so did not depend upon a similar right to such use in other persons." *Town of Paden City v. Felton,* 136 W.Va. at 140, 66 S.E.2d at 288.[21]

The *Restatement* offers the following definition of the term "adverse":

An "adverse" use . . . is a use made without the consent of the landowner, or holder of the property interest used, and without other authorization. Adverse uses create causes of action in tort for interference with property rights. The causes of action are usually actions for trespass, nuisance, or waste.

*Restatement (Third) of Property (Servitudes),* § 2.16, cmt. b. The *Restatement* goes on to say:

To be adverse . . . a use must create a cause of action for interference with an interest in property like trespass, nuisance, or interference with a servitude benefit. To be adverse, the use must be made without authority and without permission of the property owner. Thus, uses made pursuant to licenses are not adverse, nor are uses made pursuant to servitudes created expressly, by implication, or by necessity.

*Id.,* cmt. f.[22]

Professors Bruce and Ely give a comparable definition of adverse use:

Adversity does not imply animosity or personal hostility, but simply requires that the use of another's land be wrongful and without regard to the rights of the owner. . . .

**20.** John W. Fisher, II, "A Survey of the Law of Easements in West Virginia," 112 W. Va. L.Rev. 637 (2010).

**21.** The *Restatement (Third) of Property (Servitudes)* indicates that prescriptive use need not be made personally and entirely by the person claiming the prescriptive easement, but "may be made by tenants, customers, guests, and visitors of the claimant." *Id.,* § 2.16, cmt. e. *See, e.g., Keller v. Hartman,* 175 W.Va. 418, 424, 333 S.E.2d 89, 95 (1985) ("[A]dverse use by a lessee of a way appurtenant to the leasehold premises inures to the benefit of the lessor only where the way is included, expressly or impliedly in the lease."). *But see, Jamison v. Waldeck United Methodist Church,* 191 W.Va. 288, 291, 445 S.E.2d 229, 232 (1994) *(per curiam )* (Claimants lived in their house and used a roadway across church property for seven years, then leased their house for three years. Because they could not show that the use of the roadway was included, expressly or impliedly, in the lease of the house, they could not establish a prescriptive easement over the roadway.)

**22.** In West Virginia, the definitions of "trespass, nuisance, or interference with a servitude benefit" are well established, as well as a landowner's

right to injunctive relief to halt such wrongdoing. *See, e.g.,* Syllabus Point 1, *Lilly v. Bowling,* 120 W.Va. 169, 197 S.E. 299 (1938) ("Where trespasses to real estate are numerous and repeated, and promise to be continuous, under circumstances making it improbable that damages therefor can be recovered except through a multiplicity of actions at law, equity has jurisdiction to restrain the same."); *Mahoney v. Walter,* 157 W.Va. 882, 888, 205 S.E.2d 692, 697 (1974) ("It is well-settled law that the power to grant or deny injunctive relief against a nuisance as well as the scope of the injunction rest within the sound discretion of the trial court, according to the facts and circumstances of the particular case."); Syllabus Point 1, *Stifel v. Hannan,* 95 W.Va. 617, 123 S.E. 673 (1924) (one owner of an easement across a right of way may obtain an injunction against another easement owner who alters the right of way, and makes it "less convenient and useful to any appreciable extent to any of the co-owners."). *See also,* Syllabus, *Shock v. Holt Lumber Co.,* 107 W.Va. 259, 148 S.E. 73 (1929) ("An excessive use of an easement may, ordinarily, be enjoined at the instance of the owner of the servient estate.")

A use is adverse if it gives rise to a cause of action. No prescriptive easement may be created unless the landowner is able to prevent the wrongful use by resort to law.

Bruce & Ely, *The Law of Easements and Licenses in Land,* § 5:8.

█ Our case law has made it clear that if the claimant made use of the servient estate with the owner's permission, then the use was not adverse. *See, e.g.,* Syllabus Point 1, *Town of Paden City v. Felton, supra* ("if the use is by permission of the owner, an easement [by prescription] is not created by such use."); Syllabus Point 2, *Crosier v. Brown, supra* ("If the use is by his permission ... title to the easement does not come by such use.").

█ When a property owner gives another person permission to use his or her property, the law implies that a license was intended. *Restatement (Third) of Property (Servitudes),* cmt. f. Unless additional facts suggest otherwise, it is assumed that the parties intended that the property owner retain the right to revoke the license at any time. *Boyd v. Woolwine,* 40 W.Va. 282, 286, 21 S.E. 1020, 1021 (1895) ("[T]he mere permission by the owner of the land to the public to pass over the road is, without more, to be regarded as a license revocable at his pleasure.").[23] *See also, Linger v. Watson,* 108 W.Va. 180, 183–84, 150 S.E. 525, 527 (1929) (When the plaintiff demanded removal of telephone lines across plaintiff's land, the defendant sought to establish the lines had created a prescriptive easement. The Court concluded the defendant failed to establish adverse use because the plaintiff's "understanding was that the line was to remain on the premises just so long as the property owners consented thereto, and no longer."). Permission may be inferred "from the neighborly relation of the parties, or from other circumstances." 4 *Powell on Real Estate,* § 34.10[2][a].[24]

█ A use that began as permissive will not become adverse unless the license (created by the granting of permission) is repudiated. As we held in Syllabus Point 2 of *Faulkner v. Thorn,* 122 W.Va. 323, 9 S.E.2d 140 (1940) (footnote added):

such a nature that they openly and forcibly asserted directly against the actual owners of the land in such a manner that the owners would be required to take affirmative action against the plaintiffs."); *LaRue v. Kosich,* 66 Ariz. 299, 305, 187 P.2d 642, 646 (1947) ("It is a recognized rule of law that where the use of a private way by a neighbor is by the express or implied permission of the owner, the continued use is not adverse and cannot ripen into a prescriptive right."); *Wall v. Landman,* 152 Va. 889, 895, 148 S.E. 779, 781 (1929) ("[W]here the owner of land opens a way thereon for his own use and convenience, the mere use by his neighbor under circumstances which neither injures the way nor interferes with the owner's use of it, in the absence of some other circumstance indicating a claim of right, will not be considered as adverse, and will never ripen into a prescriptive right.").

For examples of "other circumstances," *see Restatement (Third) of Property (Servitudes),* § 2.16 cmt. g ("Evidence that the claimed servient estate was wild, unenclosed, vacant land overcomes the presumption of prescriptive use in many states, creating a presumption that the use was permissive. Evidence that the use was made in common with the owner of the land, or that the road over which a right of way is claimed was constructed by the owner for his own use, may also overcome the presumption of prescriptive use.")

**23.** Permissive uses do not give rise to prescriptive rights, although they may give rise to the creation of an easement by estoppel. *See Cottrell v. Nurnberger,* 131 W.Va. 391, 47 S.E.2d 454 (1948); *Stuart v. Lake Washington Realty Corp.,* 141 W.Va. 627, 92 S.E.2d 891 (1956). *See also, Restatement (Third) of Property (Servitudes),* § 2.10.

**24.** For examples of "neighborly relations," *see, e.g., Keebler v. Harding,* 247 Mont. 518, 523, 807 P.2d 1354, 1358 (1991) ("evidence of a local custom of neighborly accommodation or courtesy, without more, is sufficient to establish permissive use."); *Reed v. Soltys,* 106 Mich.App. 341, 347–48, 308 N.W.2d 201, 204 (1981) ("Acquiescence for a long term of years between adjoining owners in mutual use of a driveway does not create title in either party for the reason that the use is not hostile or adverse."); *Burrows v. Dintlemann,* 41 Ill.App.3d 83, 85, 353 N.E.2d 708, 710 (1976) ("[E]vidence of the neighborly relationship between the parties ... may give rise to a rebuttable presumption that the land was used by the permission of the owner."); *Stubblefield v. Osborn,* 149 Neb. 566, 572, 31 N.W.2d 547, 551 (1948) ("There was no claim of right or exclusive use. The most that can be said as to their crossing the lands in question is that it was permissive only, a neighborly act on the part of the owners or tenants on the land. There was no claim of ownership on the part of plaintiffs of

The use of a way over the land of another, permissive in its inception, will not create an easement by prescription no matter how long the use may be continued, unless the licensee, to the knowledge of the licensor, renounces the permission and claims the use as his own right,[25] and thereafter uses the way under his adverse claim openly, continuously and uninterruptedly, for the prescriptive period.

*In accord*, Bruce and Ely, § 5:9 ("When use of a servient estate is initially permissive, the use will confer a prescriptive right only if the user subsequently makes a direct assertion of a claim hostile to the owner."); *Town of Paden City v. Felton*, 136 W.Va. at 137–38, 66 S.E.2d at 287 ("An easement over land will not arise by prescription simply from permission of the owner of the servient estate, no matter how long the permissive use may continue; and when a use by permission has begun, in the absence of some decisive act by the claimant of the easement, which indicates an adverse and hostile claim, the use will continue to be regarded as permissive, and this is especially so when the use of the land is in common with its use by others.").

The *Restatement* goes one step further, and suggests that even if the property owner has not given explicit permission, any use "made in subordination to the property owner" is not adverse. "Subordination" means that the user is acting with authorization, express or implied, from the landowner, or acting under a right that is derivative from the landowner's title. The reason that a use made in subordination to the property owner is not adverse

... is that the property owner is not put on notice of the need to take steps to protect against the establishment of prescriptive rights. To express the idea that an adverse use cannot be in subordination

to the rights of the owner, it is frequently said that the use must be made under claim of right. This does not mean that the user must claim entitlement to a servitude or show color of title, as sometimes mistakenly asserted, but merely that the user must not act in such a way as to lead the owner to believe that no adverse claim is asserted. Use under claim of right may also mean that the user acts as the owner of a servitude would act, as opposed to the way a casual trespasser would act.

*Restatement (Third) of Property (Servitudes)*, § 2.16, cmt. f. Uses "made in subordination to the property owner" include uses by someone closely related by blood,[26] a cotenant, a licensee, or holder of some other type of easement or servitude. Because these uses are essentially authorized by the property owner, the use is not adverse.

■■■■ We hold that in the context of prescriptive easements, an "adverse use" of land is a wrongful use, made without the express or implied permission of the owner of the land. An "adverse use" is one that creates a cause of action by the owner against the person claiming the prescriptive easement; no prescriptive easement may be created unless the person claiming the easement proves that the owner could have prevented the wrongful use by resorting to the law. A use of another's land that began as permissive will not become adverse unless the license (created by the granting of permission) is repudiated.

We now turn to the incongruity with our prior case law, namely that our cases allow a finder of fact to conclusively presume that a use was adverse if the other elements of the prescriptive easement doctrine are established. *See footnote 17, supra.*

Easements by prescription are not favored in the law, because they essentially reward a

25. "Some courts use the term 'claim of right' in lieu of claim of title. Both phrases are synonymous and are distinct from the principle of 'color of title.' The latter phrase denotes that the disseisor possesses some type of written title paper; whereas under the concept of claim of title or right, the disseisor has no title paper but a mere naked assertion of ownership." *Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. at 90 n. 4, 232 S.E.2d at 528 n. 4.

26. One treatise suggests that "closely related by blood" can mean a parent and child, or close brothers, but not first cousins once removed with no evidence of a close relationship, or three unfriendly sisters. *See* 4 *Powell on Real Property* § 34.10[2][c].

trespasser and allow the taking of another's property without compensation. In this modern age, it does little to encourage civility between neighbors to have a rule whereby a landowner, who allows his neighbor to use some part of his land, runs the risk that the use may transmogrify into a legally-binding prescriptive use merely by the passage of time. Such a rule, as this case demonstrates, encourages expensive litigation between neighbors to either obtain some legal injunction to stop the use of the land, or obtain a legal ruling definitively establishing an easement. Worse, such a rule might impel neighbors to resort to aggressive, extra-legal acts in defense of their property.[27]

 We therefore hold that the burden of proving adverse use is upon the party who is claiming a prescriptive easement against the interests of the true owner of the land. To the extent our prior cases suggest that proof of adverse use is not required, or that

the continuous and uninterrupted use of another's land for ten years is presumed to be adverse, they are hereby overruled.[28] The landowner has no burden of proof. It is the person claiming the prescriptive easement who must prove, by clear and convincing evidence, that the use of the land was adverse to the true owner of the land.

### (4) "Continuous and Uninterrupted" Defined

 The second element of the prescriptive easement doctrine requires that the person claiming a prescriptive easement show that the adverse use of the servient estate was continuous and uninterrupted for at least ten years. The ten-year period is the statute of limitation for property disputes. *See* W.Va.Code, 55–2–1, *supra.*

 We have consistently defined the terms "continuous" and "uninterrupted," but only in the context of adverse possession.

27. For example, in *State v. Cook,* 204 W.Va. 591, 515 S.E.2d 127 (1999), the defendant and her husband built a fence along the edge of their property. The defendant's neighbors tore down the fence, placed roofing nails in the defendant's driveway, and bulldozed dirt and rocks onto the property. Upon learning that defendant had called the police, one neighbor began to violently beat the defendant's husband. In defense of her husband, the defendant shot and killed the neighbor. *See also, Farmers and Mechanics Mut. Ins. Co. of West Virginia v. Cook,* 210 W.Va. 394, 557 S.E.2d 801 (2001).

28. We therefore overrule the following cases, to the extent they are inconsistent with our decision today: Syllabus Point 2, *Pobro, L.L.C. v. LaFollette,* 217 W.Va. 425, 618 S.E.2d 434 (2005) (*per curiam* ); Syllabus Point 3, *Grist Lumber, Inc. v. Brown,* 209 W.Va. 530, 550 S.E.2d 66 (2001) (*per curiam* ); Syllabus Point 1, *Clain–Stefanelli v. Thompson,* 199 W.Va. 590, 486 S.E.2d 330 (1997); Syllabus Point 2, *Carr v. Constable,* 196 W.Va. 276, 470 S.E.2d 408 (1996) (*per curiam* ); Syllabus Point 2, *Moran v. Edman,* 194 W.Va. 342, 460 S.E.2d 477 (1995) (*per curiam* ); Syllabus Point 1, *Jamison v. Waldeck United Methodist Church,* 191 W.Va. 288, 445 S.E.2d 229 (1994) (*per curiam* ); Syllabus Point 1, *Crane v. Hayes,* 187 W.Va. 198, 417 S.E.2d 117 (1992) (*per curiam* ); Syllabus Point 1, *Shrewsbury v. Humphrey;* 183 W.Va. 291, 395 S.E.2d 535 (1990) (*per curiam* ); Syllabus Point 2, *Norman v. Belcher,* 180 W.Va. 581, 378 S.E.2d 446 (1989) (*per curiam* ); Syllabus Point 1, *Foster v. Sumner,* 180 W.Va. 617, 378 S.E.2d 659 (1989) (*per curiam* ); Syllabus Point 2, *Keller v. Hartman,* 175 W.Va. 418, 333 S.E.2d 89 (1985); Syllabus Point 3,

*Berkeley Development Corp. v. Hutzler,* 159 W.Va. 844, 229 S.E.2d 732 (1976); Syllabus Point 2, *Monk v. Gillenwater,* 141 W.Va. 27, 87 S.E.2d 537 (1955); Syllabus Point 1, *Holland v. Flanagan,* 139 W.Va. 884, 81 S.E.2d 908 (1954); *Town of Paden City v. Felton,* 136 W.Va. 127, 139–40, 66 S.E.2d 280, 288 (1951); Syllabus, *Derifield v. Maynard,* 126 W.Va. 750, 30 S.E.2d 10 (1944); Syllabus Point 2, *Post v. Wallace,* 119 W.Va. 132, 192 S.E. 112 (1937); Syllabus Points 1 and 2, *Hall v. Backus,* 92 W.Va. 155, 114 S.E. 449 (1922); Syllabus Points 1 and 2, *Foreman v. Greenburg,* 88 W.Va. 376, 106 S.E. 876 (1921); Syllabus Point 1, *Staggers v. Hines,* 87 W.Va. 65, 104 S.E. 768 (1920); Syllabus Point 2, *Roberts v. Ward,* 85 W.Va. 474, 102 S.E. 96 (1920); Syllabus Point 1, *Mitchell v. Bowman,* 74 W.Va. 498, 82 S.E. 330 (1914); Syllabus Points 1 and 2, *Walton v. Knight,* 62 W.Va. 223, 58 S.E. 1025 (1907); Syllabus Point 2, *Wooldridge v. Coughlin,* 46 W.Va. 345, 33 S.E. 233 (1899); Syllabus Point 3, *Boyd v. Woolwine,* 40 W.Va. 282, 21 S.E. 1020 (1895); Syllabus, *Rogerson v. Shepherd,* 33 W.Va. 307, 10 S.E. 632 (1889).

We recognize that it is the "minority rule" to hold that "use of another's property is deemed permissive, and the claimant must demonstrate the adverse character of the claimant's actions." Bruce & Ely, § 5:3. However, this view "rests on the perceptions that Americans are both neighborly and litigious, so that an unauthorized use would have been objected to. It furthers a policy favoring development of land and requiring people to pay for burdens they would impose on the land of others." *Restatement (Third) of Property (Servitudes),* § 2.16, cmt. g.

The term "continuous" means that an adverse possession has not been abandoned by the claimant during the ten-year period; "uninterrupted" means that no other party, unrelated to the party claiming adverse possession, has broken the chain of possession. For instance, in part of Syllabus Point 6 of *State v. Davis*, 140 W.Va. 153, 83 S.E.2d 114 (1954), we said:

> In the law of adverse possession, continuous possession means possession which has not been abandoned by him who claims such possession and uninterrupted possession means possession which has not been effectually broken by the possession of another person.[29]

■ In the context of prescriptive easements, "[f]or a use to be continuous, it is critical that there be no break in the attitude of mind of the claimant or the claimant's predecessor which would amount to a recognition of subordination to the servient owner's consent or an abandonment of the use in response to the servient owner's demand." *Wehde v. Regional Transp. Authority*, 237 Ill.App.3d 664, 680–81, 178 Ill.Dec. 190, 604 N.E.2d 446, 458 (1992). A claimant's use of another's land need not be regular, constant, or daily in order to be "continuous." "[T]he evidence need not show a constant use in order to establish continuity; rather, continuity is established if the evidence shows a settled course of conduct indicating an attitude of mind on the part of the user or users that the use is the exercise of a property right." *Keefer v. Jones*, 467 Pa. 544, 548, 359

A.2d 735, 737 (1976). "All that is necessary is that the use be as often as required by the nature of the use and the needs of the claimant." *Richards v. Pines Ranch, Inc.*, 559 P.2d 948, 949 (Utah 1977).

■ The existence of gaps in time between the claimant's use of another's land will not necessarily destroy the continuity of use.

> Easements that are seasonal or periodical may be acquired by prescription. For example, one may obtain a prescriptive easement by driving cattle to and from a summer range, by using a beach or a driveway only during the summer, by traveling a roadway in the haying season, or by making seasonal use of a path. Likewise, intermittent but recurring use of a rural roadway for hauling wood and other purposes constitutes the required continuity. Further, in an unusual case, ... a country club acquired a prescriptive easement to use adjacent land as a rough when several poorly hit golf balls landed on the servient estate each day. In an equally unusual circumstance, the continuity requirement was satisfied by the existence and infrequent use of a fire escape between two buildings. It has also been held that infrequent use of a roadway to visit lots purchased for eventual retirement living was continuous. Moreover, in assessing the continuity requirement courts will consider use by visitors, service providers, and family members attributable to the claimant.

---

29. *See also, Somon v. Murphy Fabrication & Erection Co.*, 160 W.Va. at 91, 232 S.E.2d at 529 ("For the possession to be 'continuous' is merely to state that it must last for the statutory period, which, as we have seen, is the fundamental basis for the doctrine of adverse possession."); Syllabus Point 8, *Parkersburg Indus. Co. v. Schultz*, 43 W.Va. 470, 27 S.E. 255 (1897) ("Adverse possession is lost by break in its continuity, by abandonment, or other cause, before the bar of the statute is complete, and seisin is restored to the true owner. A subsequent entry is a new disseisin, and cannot be added to the former possession."); Syllabus, *Swann v. Young*, 36 W.Va. 57, 14 S.E. 426 (1892) (adverse possession "must be continuous and uninterrupted for (10 years by our law) the period prescribed by the statute,— 'continuous,' in the sense of not being abandoned by himself; 'uninterrupted,' in the sense of not

being effectively broken by another."); *Taylor v. Town of Philippi*, 35 W.Va. 554, 556, 14 S.E. 130, 132 (1891) (Adverse possession "must be uninterrupted and continuous; neither broken by another, nor abandoned by himself."); *Core v. Faupel*, 24 W.Va. 238 (1884) ("He must show that such adverse possession has been continued, consecutive and unbroken for the statutory period.... [U]nless the adverse claimant is so in possession of the land that he may at any time be sued as trespasser the statute will not run in his favor; and although he may have taken actual possession, if he does not continue there so that he may be sued at any time as a trespasser during the prescriptive bar, he cannot rely on the statute of limitations."). *See also*, 2 C.J.S. *Adverse Possession* § 149 (2010) ("Continuity of adverse possession for the full statutory period without interruption or breach is an essential prerequisite to the perfection of title by adverse possession.").

Bruce & Ely, *The Law of Easements and Licenses in Land,* § 5:15 (footnotes omitted).

 However, to establish a prescriptive easement, the continuity element requires "more than occasional or sporadic use of the right of way." *Newman v. Michel,* 224 W.Va. 735, 744, 688 S.E.2d 610, 619 (2009).[30] "[O]ccasional acts of trespass do not satisfy the requirement of continuity." Bruce & Ely, *supra,* § 5:15. "Intermittent use may be continuous for purposes of establishing a prescriptive easement if it is consistent with the normal use that an owner of the property would make and is sufficiently open and notorious to give notice to the owner of the servient estate that the user is asserting an easement." *Great Northern Paper Co., Inc. v. Eldredge,* 686 A.2d 1075, 1077 (Me.1996).

 The establishment of a prescriptive easement also requires that the claimant's adverse use of another's property must be "uninterrupted" for ten years. A use can only be interrupted by the landowner "asserting ownership before the prescriptive period has expired." Bruce & Ely, *supra,* § 5:15. "Actions by a third person do not interrupt an adverse usage because they do not represent an assertion of dominion by the owner.[31] Moreover, brief interruptions caused by natural forces or construction projects do not negate continuity of usage." *Id.* (Footnote added). A claimant's adverse use may be interrupted by the owner of the servient estate physically blocking the way during the prescriptive period,[32] or by the owner instituting successful legal proceedings. "Numerous courts have held when the potential servient owner, by either threats or physical barriers, succeeds in causing a discontinuance of the use, *no matter how brief,* the running of the prescriptive period is stopped." *Pittman v. Lowther,* 363 S.C. 47, 50, 610 S.E.2d 479, 480 (2005). "[A] barrier established for the purpose of, and in fact,

**30.** *See Veach v. Day,* 172 W.Va. 276, 278–79, 304 S.E.2d 860, 863 (1983) (*per curiam* ) (claimant, who had used a contested way a few days a year to hunt deer and mushrooms, had failed to establish sufficient continuity of use because "an occasional or sporadic use does not constitute 'continuous' use.... [T]o support the establishment of a prescriptive easement the use of a way must be more than occasional or sporadic."); Syllabus Point 8, *Westover Volunteer Fire Dept. v. Barker,* 142 W.Va. 404, 95 S.E.2d 807 (1957) (petitioner sought adverse possession of land that had been used for a few days each year for a number of years for the purpose of holding carnivals; Court found the use insufficient because "Occasional and sporadic acts of dominion tending to show possession of land, which are not continuous for the statutory period, do not constitute adverse possession as is contemplated by law."); *Eagle Land Co. v. Ferrell,* 97 W.Va. 608, 125 S.E. 589 (1924) ("outside of occasional acts of trespass, by pasturing and grubbing on the land, and perhaps planting a few trees," defendant could not show possession of land with enough continuity to give rise to adverse possession); *Wade v. McDougle,* 59 W.Va. 113, 52 S.E. 1026 (1906) (occasional grazing of cattle or cutting of timber or of sod on land does not constitute continuous possession sufficient to give rise to adverse possession). *See also, Fannin v. Somervell County,* 450 S.W.2d 933 (Tex.Civ.App.1970) (a group of people who occasionally used a private parcel along a river for picnicking, camping, swimming and fishing, failed to demonstrate that their use was sufficiently continuous to support a prescriptive easement.).

**31.** This element is different from adverse possession, where the actions of a third person, unrelat-

ed to the claimant, *can* interrupt an adverse possession. This is because, in order to claim adverse ownership of land, the claimant must show exclusive possession for the limitation period.

**32.** *See, e.g., Trask v. Nozisko,* 134 P.3d 544, 550 (Colo.App.2006) ("To interrupt the acquisition of a prescriptive easement before the statutory period has run, the true owner must assert a claim to the land or perform an act that would reinstate the owner's possession. An owner may interrupt the running of the statutory period by physically limiting access to the property." Use was interrupted by large earthen berm blocking road for three days.); *Kelley v. Westover,* 56 Ark.App. 56, 60, 938 S.W.2d 235, 236–37 (1997) ("[A]ny unambiguous act of the owner of the land which evinces his intention to exclude others from the uninterrupted use of the right claimed breaks its continuity so as to prevent the acquisition of an easement therein by prescription." Owner felled trees, and placed barbed wire, brush and logs, across road.); *Stiefel v. Lindemann,* 33 Conn. App. 799, 811, 638 A.2d 642, 649 (1994) ("The owner of the servient land over which the right-of-way is used may interrupt the use by committing an act that breaks its continuity." Use interrupted when owner installed fence across right-of-way and planted shrubbery.); *Pugh v. Conway,* 157 Ind.App. 44, 299 N.E.2d 214 (1973) (use interrupted when servient landowner planted a garden on most of disputed area); *Serrano v. Grissom,* 213 Cal.App.2d 300, 28 Cal.Rptr. 579 (1963) (owner plowed up road and began farming the land).

interrupting an adverse claimant's use is effective even if it is ultimately removed by the adverse claimant." *Trask v. Nozisko*, 134 P.3d 544, 553 (Colo.App.2006).

■ However, mere unheeded requests, protests, objections, or threats of prosecution or litigation by a landowner that the claimant stop are insufficient to interrupt an adverse usage. These actions must result in the interruption of the use, no matter how brief. "Indeed, complaints may strengthen the conclusion that the claimant's use was hostile." Bruce & Ely, *supra*, 5:16.

■ We therefore conclude that for an adverse use to be "continuous," the person claiming a prescriptive easement must show that there was no abandonment of the adverse use during the ten-year prescriptive period, or recognition by the person that he or she was using the land with the owner's permission. Additionally, the adverse use need not have been regular, constant or daily to be "continuous," but it must have been more than occasional or sporadic. All that is necessary is that the person prove that the land was used as often as required by the nature of the easement sought, and with enough regularity to give the owner notice that the person was a wrongdoer asserting an easement.

■ Furthermore, we hold that for an adverse use to be "uninterrupted," the person claiming a prescriptive easement must show that the owner of the land did not overtly assert ownership of the land during the ten-year prescriptive period. Mere unheeded requests, protests, objections, or threats of prosecution or litigation by the landowner that the person stop are insufficient to interrupt an adverse usage. If any act by the landowner succeeded in causing the person to discontinue the adverse use, no matter how brief the discontinuance, then the adverse use was interrupted.

### (5) "Known" or "Notorious and Visible" Adverse Use Defined

■ To create a prescriptive easement, the claimant's adverse use must either be actually known to the rightful owner of the servient estate, or be open and notorious so that a reasonable owner would have been on notice of the adverse use. "If a right of way is claimed by prescription, the claimant should allege and prove that over the prescriptive period, without interruption, he (or a predecessor in title) used the way with such open frequency as to notify its owner of the purpose to subject his land to the use." Syllabus Point 1, in part, *Nutter v. Kerby*, 120 W.Va. 532, 199 S.E. 455 (1938). *See also*, Syllabus Point 5, *Core v. Faupel*, 24 W.Va. 238 (1884) ("Adverse possession in any case, in order to effect an ouster of the owner, must in its nature possess such notoriety, that the owner may be presumed to have notice of it and of its extent. It must be open, visible and exclusive.").

"Of course, where the landowner has actual knowledge of the adverse claim, the use need not be open and notorious." Bruce & Ely, *supra*, § 5:13. *See, e.g., Conley v. Conley*, 168 W.Va. 500, 502, 285 S.E.2d 140, 142 (1981) (*per curiam*) (claimant had established a prescriptive easement to use a gas line across the servient estate because the use of the line was "obvious to all parties involved"). "*Black's Law Dictionary* defines 'actual knowledge' as 'direct and clear knowledge, as distinguished from constructive knowledge,' *Black's Law Dictionary* at 888 (8th Ed.2004)[.]" *Mace v. Ford Motor Co.*, 221 W.Va. 198, 204, 653 S.E.2d 660, 666 (2007).

The "open and notorious" element is "designed to insure that the owner of the real property which is being encroached upon has actual or constructive notice of the adverse use and to provide sufficient time to take necessary action to prevent that adverse use from ripening into a prescriptive easement." *Zimmer v. Dykstra*, 39 Cal.App.3d 422, 431, 114 Cal.Rptr. 380, 386 (1974). "In other words, the usage must be of such a nature as to charge the landowner with constructive notice." Bruce & Ely, *supra*, § 5:13. The *Restatement* offers the following reasoning:

> The purpose of the requirement that the use be open or notorious is to give the owner of the servient estate ample opportunity to protect against the establishment of prescriptive rights. To satisfy this requirement, the adverse use must be made

in such a way that a reasonably diligent owner would learn of its existence, nature, and extent. "Open" generally means that the use is not made in secret or stealthily. It may also mean that it is visible or apparent. "Notorious" generally means that the use is actually known to the owner, or is widely known in the neighborhood. Although the terms are often stated conjunctively, the requirements are disjunctive. A use that is actually known to the owner of the servient estate satisfies the requirement even though it is not open. An openly visible and apparent use satisfies the requirement even if the neighbors have no actual knowledge of it. A use that is not open but is so widely known in the community that the owner should be aware of it also satisfies the requirement....

To meet the open-or-notorious requirement, a use must generally be substantial and reasonably definite so that the landowner should be aware that an adverse use is being made. Sporadic and casual uses are generally not open or notorious....

To be open a use must be made with sufficient frequency that the owner of the servient estate has a reasonable opportunity to become aware of it. Seasonal or intermittent use may be sufficient if consistent with the character or use of the dominant and servient estates or with the normal use that would be made of a servitude of the type claimed.

*Restatement (Third) of Property (Servitudes),* § 2.17

■■■ We hold that the "open and notorious" or "actually known" requirement is designed to give the owner of the land ample opportunity to protect against another person's actions to establish a prescriptive easement. To establish that an adverse use was "open and notorious," the person claiming a prescriptive easement must show that the

wrongful use was visible and apparent, was not made stealthily or in secret, and was so conspicuous and obvious that a reasonable, prudent owner of land would have noticed. However, where the owner of the land had actual knowledge of the adverse use, the person claiming a prescriptive easement need not show that the use was open and notorious.

*(6) Identifying the line, width, starting and ending points, and use of the easement*

■■■ Our law is clear that "[a] right of way acquired by prescription for one purpose cannot be broadened or diverted, and its character and extent are determined by the use made of it during the period of prescription." Syllabus Point 3, *Monk v. Gillenwater,* 141 W.Va. 27, 87 S.E.2d 537 (1955). "When an easement has been acquired by prescription, the extent of the right so acquired is measured and determined by the extent of the user out of which it originated." Syllabus Point 4, *Foreman v. Greenburg,* 88 W.Va. 376, 106 S.E. 876 (1921). "The precise location of an easement sought to be established should be described either by metes and bounds or in some other definite way." Syllabus Point 1, in part, *Nutter v. Kerby,* 120 W.Va. 532, 199 S.E. 455 (1938).[33]

In other words, "[t]he use of the land defines the parameters of the easement." *Wheeling Stamping v. Warwood Land,* 186 W.Va. 255, 258, 412 S.E.2d 253, 256 (1991). The scope of the right acquired by prescription "will be commensurate with and measured by the use" that originally gave rise to the easement. *Shock v. Holt Lumber Co.,* 107 W.Va. 259, 262, 148 S.E. 73, 74 (1929).

For example, in *Crane v. Hayes,* 187 W.Va. 198, 417 S.E.2d 117 (1992) *(per curiam),* a roadway was built across the defendants' land in the 1920s as a logging road. It was occasionally used by the plaintiffs (and their

---

**33.** For an example of a prescriptive easement that could not be established because it could not be definitely described, *see Sticklen v. Kittle,* 168 W.Va. 147, 287 S.E.2d 148 (1981). In *Sticklen,* an airport sought a prescriptive "avigation" easement, which gives one a right to navigation in airspace over designated land. The Court found that "[v]arious practical problems would make such a prescriptive easement difficult to define,"

including problems arising from the types and number of overflying aircraft, and alterations to the flight paths of those aircraft that might involve adjacent properties. 168 W.Va. at 160, 287 S.E.2d at 155. The Court therefore concluded, in Syllabus Point 1, that "[a]n avigation easement in the airspace used by aircraft over lands adjacent to an airport cannot be acquired by prescription."

predecessors) for agricultural purposes after the 1930s, and to occasionally gather firewood or to check fences. In 1980, the plaintiffs began clearing and upgrading the road on the defendants' land, and used the road as an access to build two houses on their property. When the defendants realized the plaintiff intended to use the road across their land as an access for the new houses, the defendants blocked the road. We concluded that the plaintiffs had a prescriptive easement, but only for agricultural uses, gathering of firewood, and checking fences. The plaintiffs were "not entitled to increase the burden on the land to encompass travel for residential purposes." 187 W.Va. at 201, 417 S.E.2d at 120.

▬▬▬ The manner in which a prescriptive easement may be used is defined by the manner in which the easement was used historically.[34] "The character and purpose of the easement acquired by prescription are determined by the use made of it during the prescriptive period." Syllabus Point 3, *Burns v. Goff*, 164 W.Va. 301, 262 S.E.2d 772 (1980) (*per curiam*). The entire history of the claimant's usage of the way over which an easement is sought must be evaluated to determine the character and scope of the prescriptive easement. *See Clain–Stefanelli v. Thompson*, 199 W.Va. 590, 595, 486 S.E.2d 330, 335 (1997).

▬▬ We hold that a person claiming a prescriptive easement must prove the reasonably precise location of the starting and ending points of the land that was used adversely, the line that the use followed across the land, and the width of the land that was adversely used. Furthermore, the manner or purpose in which the person adversely used the land must be established. This is because a right of way acquired by a prescriptive easement cannot be broadened, diverted or moved; its purpose and location are determined solely by the adverse use

made of the land during the ten-year prescriptive period.

## B.

### The Lack of Evidence at Trial of a Prescriptive Easement

We now turn to the assertion by the defendants, Robert and Virginia Stegall, that plaintiff Michael O'Dell failed to establish a prescriptive easement.

As we have previously related, the plaintiff introduced the testimony of several individuals who stated that the front part of the gravel lane had, for many decades prior to 1999, been regularly used by churchgoers approximately twice a week to access a parking lot at the rear of the church. The plaintiff's expert said that he did not think the plaintiff had a prescriptive easement. Instead, the expert said it was his opinion that when Isaac Strider deeded the four lots bordering the gravel lane to others, between 1893 and 1911, Mr. Strider must have intended for the owners of the four lots to have a right to use the gravel road for ingress and egress. This was pure speculation. Yet, on the basis of this testimony, the jury concluded that the plaintiff had a prescriptive easement.

The plaintiff bore the burden of proving, by clear and convincing evidence, that he (or his predecessors in title) (1) adversely used the gravel lane against the interests of its owner; (2) that the adverse use was continuous and uninterrupted for at least ten years; (3) that the adverse use was known to the owner, or open, notorious and visible; and (4), the precise line, width, starting and ending points, and use for which the easement was sought. After carefully scrutinizing the evidence and testimony produced at trial, we think it is clear that there is insufficient evidence to support the jury's verdict.

---

**34.** History proves there are many different reasons for individuals to seek an easement. For instance, in *Perrine v. E.I. du Pont de Nemours and Co.*, 225 W.Va. 482, 498, 694 S.E.2d 815, 831 (2010), we noted how a smelting plant obtained express easements from neighboring property owners for the perpetual right to discharge "solids, liquids, smokes, dust, precipitates, gases,

fumes, vapors and other matters" "over and onto" the neighboring properties. "[A]n easement allows a person to engage in activities on another's land that, in the absence of the easement, would be a nuisance." *Quintain Dev., LLC v. Columbia Nat. Res., Inc.*, 210 W.Va. 128, 135, 556 S.E.2d 95, 102 (2001).

First and foremost, the plaintiff failed to show that his use of the gravel lane was adverse, that is, that it was wrongful and made without the express or implied permission of the rightful owner of the land. In part, this is because the plaintiff wholly failed to show that the defendants *owned the land* upon which the gravel lane rests. "The essence of an adverse use is that such use be made of the land of another." *Keller v. Hartman,* 175 W.Va. 418, 424, 333 S.E.2d 89, 95 (1985). Without question, the owner of the alleged servient estate is an indispensable party to a lawsuit to establish an easement across that estate.

The 1899 deed of the third lot (now owned by Ms. Seibert) clearly identifies the gravel lane as being owned by "I.H. Strider," and the deed conveyed a right to use the gravel lane "for ingress and egress 25 ft. wide running from the said lot through the land of I.H. Strider[.]" At no point did the plaintiff ever identify for the jury the current successor to Mr. Strider, or otherwise suggest who the current owner of the gravel lane might be. When plaintiff's counsel was asked at oral argument before this Court, he conceded that none of the parties knows who owns the gravel roadway.[35] We therefore believe that the plaintiff failed to prove any use of the gravel lane was adverse to the owner of the servient estate over which the alleged prescriptive easement crosses.

Furthermore, the plaintiff failed to show that the prior use of the gravel lane, by himself and his predecessors, was in any way wrongful toward, or without the express or implied permission of, the owner of the servient estate. The plaintiff was required to prove that his actions (and the actions of his predecessors) amounted to trespassing, and that the owner—whoever it might be—would have wanted to prevent the plaintiff's use, or the churchgoers' use, by resorting to the law. We can conceive that when Mr. Strider deeded the plaintiff's lot to the German Baptist Brethren Church in 1898, he gave implicit or explicit permission for churchgoers to use the lane. Nothing in the record suggests that the churchgoers' use of the gravel lane was anything more than a neighborly accommodation by the owner of the gravel lane.[36]

Second, the plaintiff was required to establish that the adverse use was continuous and uninterrupted for at least ten years. The record supports the plaintiff's claim that he and his predecessor's use of the gravel lane was uninterrupted for a ten year period, in the sense that there is no evidence to indicate that the owner of the gravel lane ever asserted control of the lane or that the use of the lane was discontinued. However, again, there is no evidence to support the plaintiff's claim that use was continuous, because there was no evidence that the churchgoers' use of the lane was adverse for a ten-year period, and no evidence that they believed they were using the gravel lane without the owner's permission (or otherwise in subordination to the owner). Nevertheless, if the owner of

**35.** While the record does not suggest who currently owns the land upon which the gravel lane sits, it does appear that the dismissed defendants Donald and Patricia Walker are the current successors to Mr. Strider, in that they now own what appears to be the remainder of Mr. Strider's 23–acre tract. Therefore, they may also own the servient estate. However, the Walkers have settled with the plaintiff. The settlement agreement stated that they have no interest in the gravel lane. The plaintiff's action against the Walkers has been dismissed with prejudice—and, accordingly, any suit by the plaintiff (or his successors) against the Walkers (or their successors) to establish ownership of the gravel lane would likely be barred by principles of *res judicata* or issue preclusion (*i.e.,* collateral estoppel).

**36.** Another potential problem with the plaintiff's theory "is that use of a right of way in common with the public is regarded as negativing a presumption of grant to any individual user." *Town of Paden City v. Felton,* 136 W.Va. at 137, 66 S.E.2d at 287. Cases from other jurisdictions support the notion that "the general public use of a right-of-way may raise a presumption that the use is permissive." Bruce & Ely, *supra,* § 5:9. This "public use exception" is generally stated this way:

> Where ... the same degree of use upon which the adverse claim is based has been exercised indiscriminately by the general public, individual acquisition of a prescriptive easement has generally been held impossible. In such a case, the claimant must perform some act whereby the adverse nature of the claim is clearly indicated to the owner of the servient estate.

*Hall v. Strawn,* 108 Idaho 111, 112–13, 697 P.2d 451, 452–53 (Ct.App.1985).

the servient estate is not identified at trial, then the adverse use cannot be proven.

Third, the plaintiff was required to establish that the adverse use was actually known to the owner, or so open, notorious and visible that a reasonable owner would have recognized the adverse use. The plaintiff could not establish actual knowledge of the owner without first identifying the owner. And while the plaintiff may have established a use that was so open, notorious and visible that any reasonable owner of the land would have had ample opportunity to protect against the creation of a prescriptive easement, because the plaintiff never established that the use was adverse, his claim must fail.

■ Fourth and finally, we cannot say that the plaintiff introduced clear evidence of the precise location of the land that was adversely used. The plaintiff also did not introduce clear evidence that the use for which he sought the easement was similar to the alleged adverse use during the prescriptive period. The plaintiff introduced evidence that churchgoers used the gravel lane approximately twice a week to access a parking lot at the rear of the building—a parking lot that apparently no longer exists. The plaintiff sought a prescriptive easement to use the gravel lane daily to access the side of the building. The plaintiff bore the burden of proving how his proposed daily use of the gravel lane was reasonably similar to the churchgoers' twice-a-week use of the lane. Likewise, the plaintiff bore the burden of showing how his proposed access to the side of the building was reasonably similar to the churchgoers' use of the lane to access the parking lot that used to be at the rear of the building. The plaintiff would only have been entitled to use the gravel lane for the purposes encompassed within the original ten-year prescriptive period; he was not entitled to increase the burden on the servient estate.

In sum, we conclude that the plaintiff failed to establish, by clear and convincing evidence, that a prescriptive easement was created to use the gravel lane to access a horseshoe driveway at the north side of his home for routine ingress and egress.

### C.

*Remaining Claims against the Defendants*

At trial, a jury awarded the plaintiff damages against the defendants in the amounts of $5,300 in compensatory damages, and $4,700 in punitive damages. These damages were based on: (1) the jury's determination that the defendants had intentionally interfered with the plaintiff's prescriptive easement; (2) for the tort of outrage and invasion of the plaintiff's right of privacy, because the defendants had photographed the plaintiff using the gravel lane and tape recorded a conversation between the plaintiff and one of the defendants; and (3) civil conspiracy.

After careful examination of the record, we find no evidence proving the legal elements of these causes of action.

■ First, the jury concluded that the defendants had intentionally interfered with the plaintiff's prescriptive easement allowing his ingress and egress on the gravel lane. As we just established, the plaintiff has no legal right of ingress and egress.[37] Accordingly, to the extent the jury's award is based on this claim by the plaintiff, it must be vacated.

■ Second, the jury concluded that the defendants had engaged in outrageous conduct, and had invaded the plaintiff's pri-

---

**37.** We acknowledge that Ms. Seibert settled with the plaintiff, and gave the plaintiff a "quitclaim deed of easement" that purports to give the plaintiff some sort of an easement to use the gravel lane. Since there is nothing in the record to suggest that Ms. Seibert owned the servient estate (that is, the land upon which the gravel lane passes), she had no right to grant anyone an express easement to use it.

Furthermore, the record establishes that Ms. Seibert only owns an easement that is appurtenant to the third lot, an easement which express-ly gives her a right to use the gravel lane for ingress to and egress from her lot. It is well established in other jurisdictions that an easement appurtenant adheres to the dominant estate. An easement appurtenant cannot exist apart from the dominant estate, and can be transferred only by transfer of the dominant property. Bruce & Ely, *Law of Easements and Licenses in Land*, §§ 9:1 and 9:2.

For what it is worth, the quitclaim deed from Ms. Seibert might as well as have included a grant of ownership to the Brooklyn Bridge.

vacy. We set forth the elements of a cause of action for the tort of outrage—more often referred to as the intentional or reckless infliction of emotional distress—in Syllabus Point 3 of *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998), where we stated:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

We stated in *Travis* that trial courts should first examine the proof presented by the plaintiff to determine if the defendant's conduct may legally be considered "extreme and outrageous." We held, in Syllabus Point 4 of *Travis*:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

 We first recognized a "right of privacy" in *Roach v. Harper*, 143 W.Va. 869, 105 S.E.2d 564 (1958). We stated, in Syllabus Point 1 of *Roach*:

> The right of privacy, including the right of an individual to be let alone and to keep secret his private communications, conversations and affairs, is a right the unwarranted invasion or violation of which gives rise to a common law right of action for damages.

We have said that there are at least four ways that the right to privacy may be invaded:

> An "invasion of privacy" includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public.

Syllabus Point 8, *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70 (1984). The plaintiff appears to assert that the defendants unreasonably intruded upon his seclusion, by the defendants (a) taking his photograph as he drove on the gravel lane, and (b) surreptitiously tape recording a conversation one of the defendants had with the plaintiff while standing on the lane.

After careful examination of the record, we see no evidence of emotional distress by the plaintiff that "was so severe no reasonable person could be expected to endure it." Syllabus Point 3, *Travis, supra*. We find no evidence to support the conclusion that the defendants' actions, as a matter of law, were so extreme and outrageous as to constitute intentional infliction of emotional distress.

 Likewise, we see no evidence that the plaintiff's right "to be let alone and to keep secret his private communications" was in any way breached by the defendants. The plaintiff had no right to privacy—that is, no right to not have his car photographed—while driving in a public place. Further, the defendants did not record a secret, private communication; they recorded a public communication, between the plaintiff and one of the defendants, held in an open place.[38]

---

**38.** The actions of the defendant do not appear to be illegal or tortious under the West Virginia Wiretapping and Electronic Surveillance Act. The Act says that if one of the parties to a communication consents to the interception or recording of the communication, and the pur-

pose of the interception does not otherwise constitute a criminal or tortious act, then the interception is permitted by the Act. The Act, *W.Va. Code,* 62–1D–3(e) [2007], states:

> It is lawful under this article for a person to intercept a wire, oral or electronic communi-

The defendants' actions, while perhaps indignant and annoying, were not undertaken or expected to cause severe emotional distress to the plaintiff. The plaintiff's evidence does not show that the defendants' actions intentionally or recklessly inflicted emotional distress on the plaintiff.

Instead, the defendants were correct in their belief that the plaintiff did not have a legal right to use the gravel lane. While the defendants do not own the gravel lane, the evidence presented demonstrates that the defendants have an easement to use the lane to access the Leetown Pike/Route 15 that is implied, either by necessity or by prior use of the lane. In *Cobb v. Daugherty*, 225 W.Va. 435, 693 S.E.2d 800 (2010), we defined an easement implied by necessity in Syllabus Point 4:

> To establish an easement implied by necessity (which in West Virginia is called a "way of necessity"), a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the dominant and/or servient estates to another); (3) at the time of the severance, the easement was strictly necessary for the benefit of either the parcel transferred or the parcel retained; and (4) a continuing necessity for an easement.

In Syllabus Point 6 of *Cobb*, we defined an easement implied by a prior use of the land:

> To establish an easement implied by a prior use of the land, a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the dominant and/or servient estates to another); (3) the use giving rise to the asserted easement was in existence at the time of the conveyance dividing the property, and the use has been so long continued and so obvious as to show that the parties to the conveyance intended and meant for the use to be permanent; and (4) the easement was necessary at the time of the severance for the proper and reasonable enjoyment of the dominant estate.

The record establishes a prior common ownership of the defendants' lot and Mr. Strider's 23–acre tract, as well as a severance in 1911. On the one hand, at the time the defendants' lot was created, it was strictly necessary, and continues to be necessary, for the defendants to be able to use the gravel lane to access a public highway. Hence, the defendants have an easement implied by necessity. On the other hand, in 1911, the gravel lane had clearly and obviously been in existence (as was evidenced by the 1899 deed of the third lot that gave the owner an express easement), the 1911 deed referred to the lane as a "lane to public road," and the lane was necessary in 1911 for the reasonable enjoyment of the defendants' lot. Hence, the defendants can also establish an easement implied by a prior use of the gravel lane to access their lot.

The defendants were apparently acting out of their sincere belief that the plaintiff was wrongfully using the gravel lane, and that the plaintiff's use of the lane would cause wear and tear that the defendants would be contractually obligated to repair. On this record, we believe that the trial court should, as a matter of law, have entered judgment for the defendants on the counts of outrage and invasion of privacy.

The final count alleged by the plaintiff is that the defendants were engaged in a civil conspiracy. We recently set forth the definition of a civil conspiracy in Syllabus Points 8 and 9 of *Dunn v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255 (2009):

> 8. A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

> 9. A civil conspiracy is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not

cation where the person is a party to the communication or where one of the parties to the communication has given prior consent to the interception unless the communication is inter-

cepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or the constitution or laws of this state.

actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s).

We made clear in *Dunn v. Rockwell* that a civil conspiracy must be based on some underlying tort or wrong. As we have discussed above, for all of the torts or wrongs alleged by the plaintiff (interference with the plaintiff's prescriptive easement, outrage, and invasion of privacy) there is insufficient evidence to support the jury's verdict. Accordingly, we find that there is also insufficient evidence to support the jury's finding that the defendants engaged in a civil conspiracy to commit any of those alleged torts or wrongs.

## IV.

### *Conclusion*

After careful consideration of the record and the arguments of the parties, we find that the plaintiff failed to establish a right to an easement by prescription to use the gravel lane, and failed to prove the necessary elements of the other causes of action. Thus, we believe that the circuit court should have granted judgment to the defendants.

Accordingly, the jury's verdict must be reversed, and the case remanded for entry of judgment in favor of the defendants.

Reversed and remanded.