## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**James Scott Kuhn,**
**Petitioner, Defendant below,**

**vs.) No. 19-0805** (Mineral County 18-C-45)

**Robin L. Ravenscroft Living Trust,**
**Respondent, Plaintiff below,**

**and**

**Robin L. Ravenscroft and Norman L. Ravenscroft,**
**Respondents, Third Party Defendants Below.**

**FILED**
**November 18, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner, James Scott Kuhn, appeals the Circuit Court of Mineral County's August 16, 2019, order denying his motion to alter or amend the court's June 26, 2019, "Trial Order" in a declaratory judgment action. Mr. Kuhn argues that the circuit court erroneously concluded that he does not possess an express easement in the form of a right-of-way running from the south-west corner of his lot, across property owned by the respondent Robin L. Ravenscroft Living Trust ("Trust"), to U.S. Route 50. The Trust, along with its trustees Norman and Robin Ravenscroft (collectively referred to as "the respondents" or "the Ravenscrofts"), respond in support of the circuit court's orders.[1]

After considering the parties' written and oral arguments, as well as the appendix record on appeal and the applicable law, this Court concludes that the circuit court erred when rejecting Mr. Kuhn's claim of an express easement across the Ravenscrofts' property. Because there are no new issues of law presented in this matter, we conclude that this case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure for reversal in a memorandum decision.

## I. Factual and Procedural History

In 1977, Vaughn and Bertha Amtower conveyed approximately 36.90 acres of land (the "parent tract") located in the New Creek District of Mineral County to Ellis and Linda Doll. The Dolls planned to develop a subdivision named "Claysville Heights" on this property. Surveyor

---

[1] Mr. Kuhn is represented by Luca D. DiPiero, Esq., and David R. Collins, Esq. The Ravenscrofts are represented by Jason R. Sites, Esq.

1

David Vanscoy, P.E., surveyed a portion of the parent tract into six separate lots and prepared a "Plat of Subdivision of Claysville Heights." However, this master plat was never recorded.[2]

The Dolls sold three of the lots—identified from west to east as Lot 6, Lot 5, and Lot 3, each approximately two acres in size—to three different buyers. The Deed for each of these three lots was accompanied by a Plat of Survey that was recorded with the respective Deed. Each Deed describes, and each Plat depicts, a thirty-foot wide right-of-way along the adjoining northern property lines of the three lots, running in an eastward direction (referred to herein as the "northern right-of-way"). The Plat for Lot 3 shows that the northern right-of-way then turns to the south-east so that it can eventually connect to Route 50. At some point in time, a rough road was constructed on this northern right-of-way connecting the northern side of the three sold lots to Route 50 (referred to as the "back road").

The Dolls conveyed Lot 6 to Daniel and Patricia Shrout by Deed dated April 29, 1986. This Deed, along with a Plat for Lot 6, is recorded at Mineral County Deed Book 243, Page 373. Notably, the Shrouts' Deed and Plat also describe *another thirty-foot wide right-of-way in a different location* (referred to herein as the "southern right-of-way"). This Deed defines the property that was being conveyed to the Shrouts by referencing the location of both rights-of-way:

> Beginning at a point in centerline of a 30' right-of-way leading to U.S. 50, said point also being located S74º52'30"W, 15.00' from a steel pin in line of Lot 4; thence, with line of Lot 7, N5º15'10"W, 391.14' to a point in road, witnessed by rebar set 15' from centerline; thence with centerline of another 30' right-of-way leading to U.S. 50, N80º19'15"E, 229.87' to a point in centerline of right-of-way; thence, with line of Lot 5, S5º39'13"E, 368.56' to a steel pin in line of Lot 4; thence, with line of Lot 4, S74º52'30"W, 220.25' to a steel pin set 15' from centerline of said right-of-way; thence, S74º52'30"W, 15.00' to BEGINNING and containing 2.01 acres more or less as more fully shown on Plat of Survey of Lot 6 of Claysville Heights as surveyed by David G. Vanscoy, P.E. No. 6649 attached hereto as part hereof.
> Note: Right-of-way shown above is reserved by grantor for use of all property owners along roadway and any others entitled to use said right-of-way.

The Plat depicts the southern right-of-way as originating at the south-west corner of Lot 6 and running southward along the western border of another lot in the subdivision, Lot 4. The existence of this southern right-of-way, and its thirty-foot width, are stated both on the Plat and in the language of the Deed. The Plat shows and describes the beginning point of the right-of-way (at the southwest corner of Lot 6), and shows the course and width of the right-of-way (heading south along the western boundary of Lot 4, fifteen feet on either side of Lot 4's boundary line), but does

---

[2] Mr. Vanscoy testified that this land was subdivided before a planning commission was established in the area.

not illustrate the endpoint of the right-of-way. However, language in the Deed specifies that the endpoint is Route 50.

The Shrouts' Deed further provides that

> [t]he roads and rights of way constructed and to be constructed by the Grantors shall be for the use and benefit of all owners of property whose source of title is derived from the Grantors, and the Grantors shall maintain said roads and rights of way until such time as the Grantors have conveyed four (4) parcels of land in this subdivision.

The Deed goes on to state that after four lots are sold, a property owners' association would be formed and take over responsibility for the roads. However, a fourth lot was never conveyed, and no property owners' association was ever formed.

After conveying the three lots, the Dolls filed a Chapter 7 bankruptcy. The subdivision was never finished. When the bankruptcy case was filed, no houses had been built and no road had been constructed over the southern right-of-way. The bankruptcy trustee eventually sold 28.38 acres of the residue from the parent tract to the respondents Norman and Robin Ravenscroft, who subsequently deeded the property to the respondent Robin L. Ravenscroft Living Trust. The Ravenscrofts' deed expressly states that the real estate is "subject to all reservations, exceptions and easements of record in the chain of title, and includes all appurtenances and privileges passed through prior deeds" including being "subject to those rights of way set forth in . . . Deed Book 243, page 373[,]" which is the Shrouts' Deed for Lot 6. The Ravenscrofts have built a home on their property, including spending over $70,000 to construct a long, blacktopped driveway leading from Route 50 up to their house.

Michael and Elizabeth Fitzgerald purchased the unimproved Lots 3, 5, and 6 in 2015. On March 28, 2018, the Fitzgeralds sold the three lots to Mr. Kuhn, the petitioner herein. Mr. Kuhn has testified that he intends to timber his three lots and build a home, but the trucks and large equipment that he needs to improve his property cannot traverse the back road because it is steep, has sharp curves, and is encroached upon by neighboring structures.

Mr. Kuhn contacted the Ravenscrofts and asserted his right to use the southern right-of-way. According to Mr. Kuhn, the southern right-of-way runs from the southwest corner of his Lot 6 and coincides with the bottom one-third to one-half of the Ravenscrofts' driveway to reach Route 50. The Ravenscrofts objected to Mr. Kuhn's use of their property, particularly since his heavy equipment would damage the blacktop on their driveway and because Mr. Kuhn stated his intention of removing trees from their property (presumably to widen the right-of-way to the full thirty feet). According to the Ravenscrofts, Mr. Kuhn has refused to pay for any damages that he might cause.

On August 16, 2018, the Ravenscrofts filed a complaint in circuit court arguing that Mr. Kuhn has no easements of any kind over their property. They sought a declaration of their rights to the property and a permanent injunction to stop Mr. Kuhn from using their property. Mr. Kuhn answered the complaint asserting that he had acquired the southern easement by virtue of the Dolls'

3

Deed to the Shrouts. Mr. Kuhn also filed a counterclaim for damages that he allegedly incurred due to being deprived of the use of the right-of-way.

The circuit court received testimony and documentary evidence at a temporary injunction hearing and a bench trial. The parties testified, and Mr. Kuhn presented testimony from the original surveyor, Mr. Vanscoy, who was qualified as an expert in the field of surveying. Mr. Vanscoy opined that there is a right-of-way running from the south-west corner of Lot 6 to Route 50. Notably, Mr. Vanscoy testified that, although the Shrouts' Deed and Plat for Lot 6 did not specify a metes and bounds description for the exact endpoint of the southern right-of-way, the endpoint is known because the Dolls owned only a thirty-foot frontage on Route 50 on this side of the parent tract. Because the southern right-of-way is thirty-feet wide, the only possible ending point is this thirty-foot frontage where the Ravenscrofts' driveway is situate. Mr. Vanscoy testified that Mr. Doll specifically purchased this thirty-foot frontage from Mr. Amtower so that he could bring this right-of-way down to Route 50.[3] Mr. Vanscoy also testified that his surveying crew found a pin at the southwest corner of Lot 6, another pin fifteen feet from the corner of Lot 4 to indicate the location of the right-of-way, and a pin marking one corner of the frontage on Route 50. These pins were laid in the 1980's when he surveyed the subdivision.

Mr. Kuhn also presented testimony from his predecessor-in-title, Mr. Fitzgerald. Mr. Fitzgerald testified to a conversation he had with Mr. Ravenscroft in which Mr. Ravenscroft acknowledged that there was a right-of-way leading south across his property to Route 50. In response, the Ravenscrofts offered an affidavit from Mr. Fitzgerald's predecessor-in-title, Mr. Shrout; this affidavit was ultimately admitted into evidence over Mr. Kuhn's objection. In the affidavit, Mr. Shrout denied that his deed gave him the right to use the Ravenscrofts' driveway and denied that he transferred any rights-of-way when he sold Lot 6.

The Ravencrofts argued that because the subdivision was never constructed and the master plat was never recorded, there was never any private dedication of roadways for the use of the property owners. Because the Shrouts' Deed spoke of the roads in the subdivision being for the use and benefit of the property owners, but there was never any private dedication of the roads, they argue that the Shrouts' Deed did not create any rights-of-way. They also argued that it is impossible to ascertain the specific location of any purported southern easement from a review of recorded documents. The Ravenscrofts asserted that there was another road in a different location on the property in the 1970's, and that the intent of the Deed for Lot 6 could have been for the southern right-of-way to be located on that road.

On cross-examination, Mr. Vanscoy recalled that there was an existing road in a different location in the 1970's. However, he recalled that the road originated on Route 50 at a trailer park *beside* the thirty-foot frontage that Mr. Doll purchased in fee simple. Mr. Vanscoy explained that Mr. Doll leased, but did not own, the trailer park property, thus he could not have deeded a right-of-way across the trailer park property. Mr. Vanscoy recalled that the existing road went from the trailer park and up to some wells on the parent tract, and it was only accessible with a four-wheel drive vehicle.

---

[3] One of the briefs suggests that, in addition to being the surveyor for the subdivision, Mr. Vanscoy is also Mr. Doll's brother-in-law.

After considering the evidence, the circuit court concluded that Mr. Kuhn does not possess any express easements over the Ravencrofts' property. The circuit court found that although a southern easement is shown on the Plat to Lot 6 and is mentioned in the Deed's description, "no actual road was ever constructed or came into existence" and "[t]here is nothing of record to show the location of the easement where it extended from Lot 6 to US Route 50." The circuit court found that Mr. Kuhn merely "assumed" that a right-of-way entered Route 50 at the location of the Ravencrofts' driveway, but there was another roadway in existence at the time of severance while the driveway had not even been built at that time. Furthermore, the circuit court concluded that although the developer may have intended to construct an easement leading from Lot 6 to Route 50, this was never done and there was no master plat recorded. The circuit court ruled that Mr. Kuhn's property is not landlocked because he has an implied easement by necessity over the back road. Finally, the circuit court found that Mr. Kuhn failed to satisfy his burden of proof with respect to his counterclaim for damages. The circuit court's rulings were set forth in a bench trial order entered on June 26, 2019.

Mr. Kuhn filed a motion to alter or amend the judgement, which the circuit court refused on August 16, 2019. In this August order, the circuit court also declined to enter a permanent injunction, reasoning that Mr. Kuhn was fully aware that he could not trespass upon the Ravenscrofts' property and an injunction was unnecessary. Mr. Kuhn now appeals the adverse rulings in the June 26 and August 16, 2019, orders.

## II. Standard of Review

Mr. Kuhn appeals from the circuit court's order denying his motion to alter or amend judgment. "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. American Travellers Life Insur. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998). The underlying judgment was an order entered after a bench trial, to which we apply the following standard of review:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996). With this in mind, we consider the parties' arguments.

## III. Discussion

On appeal, Mr. Kuhn contends that he has an express easement over the southern right-of-way by virtue of the 1986 Deed from the Dolls conveying Lot 6 to the Shrouts.[4] He argues that in this Deed, the Dolls also conveyed the southern right-of-way over the residuary parent tract, and that as the successor-in-title to the Shrouts, he now has the right to this easement. The Ravenscrofts disagree with all of Mr. Kuhn's arguments. The Ravenscrofts argue that no rights-of-way were conveyed or dedicated because the subdivision never came into existence, and they argue that the purported southern right-of-way is not described with sufficient specificity in the Shrouts' Deed or in any document that is of record.

Our task in this appeal is to consider the meaning of the Shrouts' Deed. When confronted with the question of whether a legal instrument has conveyed a property right, a court's job "is to ascertain the true intent of the parties as expressed by them in the deed, lease or other written instrument under consideration." *Sally-Mike Properties v. Yokum*, 175 W. Va. 296, 300, 332 S.E.2d 597, 600 (1985) (quoting *Davis v. Hardman*, 148 W. Va. 82, 88-89, 133 S.E.2d 77, 81 (1963)). "The language of the instrument itself, and not surrounding circumstances, is the first and foremost evidence of the parties['] intent. Resort to rules of construction and aids to interpretation, including extrinsic evidence, is proper where the language of an instrument is ambiguous and subject to more than one meaning." *Sally-Mike Properties*, 175 W. Va. at 300, 332 S.E.2d at 601.

In this case, a review of the Shrouts' Deed and Plat plainly evidences the intent to create a right-of-way leading from the southwest corner of Lot 6, heading south to Route 50, for the use and benefit of all the property owners. This right-of-way is detailed in the Deed language and is illustrated on the Plat. The Deed provides: "Note: Right-of-way shown above is reserved by grantor for use of all property owners along roadway and any others entitled to use said right-of-way" and "[t]he roads and rights of way constructed and to be constructed by the Grantors shall be for the use and benefit of all owners of property whose source of title is derived from the Grantors[.]"As such, the southern right-of-way was created by express reservation in the Deed. The Dolls obviously wanted this point of ingress and egress to be available to the property owners;

---

[4] Mr. Kuhn's assignments of error are that the circuit court (1) erred when concluding that he does not have an express easement over the southern right-of-way; (2) misapplied the unity doctrine; (3) misapplied the law by requiring that an express right-of-way be "opened" in order to exist; (4) erred in concluding that there is no southern right-of-way, despite finding that the Plat for Lot 6 illustrated an easement and the original developer may have intended to construct an easement; (5) disregarded the weight of the evidence when finding that the southern right-of-way did not enter Route 50 at the location of the Ravenscrofts' driveway; (6) erred in denying an award of damages on Mr. Kuhn's counterclaim; and (7) erred by entering two different orders from the temporary injunction hearing. Because many of these assignments of error overlap, they will be discussed together. However, we reject the last assignment of error out of hand. The circuit court inadvertently entered temporary injunction orders that were submitted by both sides, but the court quickly corrected this mistake at the beginning of the bench trial and absolutely no prejudice resulted.

indeed, if they had not created this right-of-way, Lot 4 would have been landlocked.[5] Although the Dolls did not construct a road on the southern right-of-way before they went bankrupt, they nonetheless carved out and conveyed the right-of-way. As a current property owner whose source of title is derived from the grantors, Mr. Kuhn has the right to use and benefit from the southern right-of-way.

When rejecting Mr. Kuhn's claim, the circuit court emphasized that no road had ever been constructed on the southern right-of-way. However, this is an express easement set forth in the Shrouts' Deed, and an express easement is not extinguished by non-use:

> [T]here is law in this State that an existing right-of-way is not defeated by mere non-user [sic]. *Wooldridge v. Coughlin*, 46 W. Va. 345, 33 S.E. 233 (1899). Additionally, as late as 1988, the Court indicated that while easements created equitably may be extinguished by acts including abandonment, easements by grant, such as the easement claimed in the present case, may not. See note 5 of *Lyons v. Lyons*, 179 W. Va. 712, 371 S.E.2d 640 (1988), which cites *Moyer v. Martin*, 101 W. Va. 19, 131 S.E. 859 (1926).

*Orlandi v. Miller*, 192 W. Va. 144, 149, 451 S.E.2d 445, 450 (1994). Similarly,

> [w]here a decree of partition awards to the partitioners a right of way for ingress and egress over and through the land as partitioned, by the most practicable way to the public road, the mere nonuse or intermittent use of a way through the lands partitioned by one or more of the partitioners will not extinguish the easement granted by the decree; nor will the use by one or more of the partitioners of another way of ingress and egress over abutting lands owned by a stranger to the partition suit be an election to use that route to the extinguishment of the way decreed.

Syl. Pt. 1, *Moyer v. Martin*, 101 W. Va. 19, 131 S.E. 859 (1926). "An easement by grant is radically different from an easement by necessity. And it is universally held that mere nonuser [sic] of an easement by grant, however long, will not extinguish the right, unless otherwise provided by statute or by provision in the grant itself." *Id.* at 24, 131 S.E. at 861 (citations omitted). *C.f. Strahin v. Lantz*, 193 W. Va. 285, 288, 456 S.E.2d 12, 15 (1995) (recognizing that easement by grant is not abandoned by non-use, but holding *prescriptive* easement can be abandoned).

Next, we turn to the question of whether the location of the southern right-of-way was set forth in the Shrouts' Deed and Plat with sufficient certainty.

---

[5] The three recorded plats for Lots 3, 5, and 6 show the location of the planned Lot 4, and it does not touch the northern right-of-way/back road. Lot 4 would have been landlocked if the Dolls had not expressly reserved the southern right-of-way for the benefit of all property owners.

> "A deed granting to a . . . [grantee] land for its right of way
> must contain on its face a description of the land in itself certain, so
> as to be identified, or if not in itself so certain, it must give such
> description as, with the aid of evidence outside the deed, not
> contradicting it, will identify and locate the land, otherwise the deed
> is void for uncertainty." Syllabus Point 1, *Hoard v. Railroad Co.*, 59
> W. Va. 91, 53 S.E. 278 (1906).

Syl. Pt. 2, *Highway Prop. v. Dollar Sav. Bank*, 189 W. Va. 301, 431 S.E.2d 95 (1993). However, "[n]o part of a deed should be declared void for uncertainty if it is possible, by any reasonable rule of construction, to ascertain from the description, aided by extrinsic evidence, the property intended to be affected." *Sally-Mike Properties*, 175 W. Va. at 298, 332 S.E.2d at 598, syl. pt. 3.[6]

The beginning point of the southern right-of-way is specified in the Shrouts' Deed in a plain and unambiguous manner. Indeed, the Deed specifies the coordinates of this point as "being located S74º52'30"W, 15.00' from a steel pin in line of Lot 4." The starting point for the right-of-way is also the south-west corner of Lot 6. Mr. Vanscoy's crew located the pin in the line of Lot 4 when preparing for this bench trial. The width of the right-of-way is also clearly stated in both the Deed and on the Plat as being thirty feet wide. The Plat depicts that fifteen feet of the right-of-way lies on one side of the western boundary line for the proposed Lot 4, while the other fifteen feet lies on the other side of this boundary line. Moreover, the course direction for the right-of-way is also plainly and unambiguously set forth. The Deed specifies that the right-of-way runs to Route 50, and the Plat shows the right-of-way heading south along the western boundary of Lot 4 toward Route 50 (Lot 4 sits to the south of Lot 6).

The only issue that is disputed with regard to the location of the southern right-of-way is its specific ending point along Route 50. Mr. Kuhn contends that this ending point is the location of the Ravenscrofts' driveway. The Ravenscrofts argue, and the circuit court found, that the ending point could have been intended to be somewhere else along Route 50—possibly the location of the existing road through the trailer park. To address this issue, we must turn to extrinsic evidence. *See*, *e.g., Sally-Mike Properties*, 175 W. Va. at 298, 332 S.E.2d at 598, syl. pt. 3 ("No part of a deed should be declared void for uncertainty if it is possible, by any reasonable rule of construction, to ascertain from the description, *aided by extrinsic evidence*, the property intended to be affected." (emphasis added)).

Critically, the surveyor, Mr. Vanscoy, testified that the only possible ending point for the southern right-of-way is the thirty-foot frontage that Mr. Doll owned along Route 50, which is also the location of the Ravenscrofts' driveway. The Doll's parent tract only included this thirty-foot

---

[6] We observe that there is now a statute, West Virginia Code § 36-3-5a (2013), requiring a deed or other instrument granting or reserving an easement or right-of-way to include a specific description of the right-of-way. If the instrument does not comply with the statute, the clerk of the county commission is not permitted to accept the document for recordation. *Id.* at § 36-3-5a(d). However, this statute was first enacted in 2003, many years after the 1986 Deed to the Shrouts where this express right-of-way was created, and is thus inapplicable to this case.

frontage. Because this is a thirty-foot right-of-way, the only place that the Dolls could have legally conveyed the right-of-way is the location where the Ravenscrofts' driveway now joins Route 50. Mr. Vanscoy rejected the notion that the trailer park road was the intended location of the right-of-way, and we agree inasmuch as Mr. Vanscoy's testimony established that Mr. Doll did not own the trailer park property in fee simple.

Although we resort to evidence extrinsic to the Shrouts' Deed to decide this one issue, there is nothing about this evidence that the Ravenscrofts would not, or should not, have known. They should have been on notice of the right-of-way inasmuch as their deed was expressly "subject to all reservations, exceptions and easements of record in the chain of title, including all appurtenances and privileges passed through prior deeds" including being "subject to those rights of way set forth in . . . Deed Book 243, page 373[,]" which is the Shrouts' Deed. Mr. Fitzgerald's trial testimony confirmed that Mr. Ravenscroft had actual knowledge of the presence of the southern right-of-way. Moreover, the Ravenscrofts should have been aware of the limited, thirty-foot frontage on the Doll's parent tract *because this is the same frontage that they purchased when they bought the residue of the parent tract from the bankruptcy trustee.* They knew, or should have known, that there is no other access to Route 50 from this side of their property.

For the foregoing reasons, we conclude that the circuit court abused its discretion when declaring that Mr. Kuhn does not enjoy the use and benefit of the southern right-of-way leading from the southwest corner of Lot 6 to the thirty-foot frontage along Route 50 that coincides with the location of the Ravenscrofts' driveway. As such, we reverse the circuit court's June 26, 2019, Trial Order. This case is remanded to the circuit court for entry of an order declaring Mr. Kuhn's rights. In addition, the circuit court should address whether cost-sharing measures should be put into place for the maintenance of the right-of-way. Finally, because Mr. Kuhn's counterclaim for money damages was denied on the basis of the circuit court's erroneous conclusion that there was no southern right-of-way, on remand the court must also address the counterclaim.[7]

For the foregoing reasons, we reverse and remand this case to the circuit court.

Reversed and Remanded with Directions.

**ISSUED:** November 18, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice John A. Hutchison

---

[7] Although we reverse the circuit court's ruling regarding the existence of the southern right-of-way, we express no opinion on the merits of Mr. Kuhn's counterclaim for money damages.

**Dissenting:**

Justice Elizabeth D. Walker
Justice Evan H. Jenkins


Jenkins, Justice, dissenting:

In this case, the majority has determined that an express easement has been granted to Mr. Kuhn by virtue of the deeds in his chain of title and that such easement traverses a portion of the driveway that the Ravenscrofts constructed for their own, personal use. Because the deed language in question as well as the extrinsic evidence submitted by Mr. Kuhn in support of his claimed right-of-way do not define the allegedly express easement with sufficient certainty so as to be able to ascertain its precise location, I respectfully dissent from the majority's decision in this case.

The majority correctly quotes the metes and bounds description of the Lot 6 parcel, which specifically references *a* point of the alleged front right-of-way easement that Mr. Kuhn argues he has been granted. However, *a single point* does not provide sufficient specificity to establish the precise location of an express easement. *See* Syl. pt. 1, in part, *Nutter v. Kerby*, 120 W. Va. 532, 199 S.E. 455 (1938) ("The *precise* location of an easement sought to be established should be described either by metes and bounds or in some other *definite* way." (emphasis added)); Syl. pt. 1, in part, *Hoard v. Huntington & B.S.R. Co.*, 59 W. Va. 91, 53 S.E. 278 (1906) ("A deed granting . . . a . . . right of way must contain on its face a description of the land in itself *certain*, so as to be identified, or, if not in itself so certain, it must give such description as, with the aid of evidence outside the deed, not contradicting it, will *identify and locate* the land[.]" (emphasis added)). Rather, *both* the starting point *and* the ending point are required to be provided so that the location of the express easement may be ascertained with certainty. *See, e.g.*, *Folio v. City of Clarksburg*, 221 W. Va. 397, 401, 655 S.E.2d 143, 147 (2007) (per curiam) (observing that "a deed which described the dimensions of a right-of-way but did not establish its beginning point was insufficient to convey the right-of-way" (citing *Hoard*, 59 W. Va. 91, 53 S.E. 278)).[8] Absent further reference points in the metes and bounds description of Lot 6, Mr. Kuhn must rely on additional deed language to establish the existence and location of his alleged easement.

---

[8]While this requirement that the exact location of an express easement be defined in the granting deed with precision originally was recognized only by the common law of this State, the Legislature also has embraced this need for certainty. *See generally* W. Va. Code § 36-3-5a (enacted 2003; amend. 2013) (requiring instrument granting easement or right-of-way to provide description thereof).

However, while the majority also accurately quotes relevant language from Mr. and Mrs. Shrout's[9] deed that follows the metes and bounds description of the parcel and purports to establish the express easement at issue herein, the majority noticeably omits any reference to the deed's preceding, qualifying language that clearly explains the scope of such easement by setting forth the original grantors' intent in making this reservation. The Shrout deed language detailing the reservation of an easement, and defining its limitations, provides, in full, as follows:

> *There is hereby RESERVED an easement as necessary in, along, over, under and through any roadway or right of way constructed and to be constructed by the Grantors for the benefit of the subdivision*, as well as an easement of necessity and of a minimum width of five (5) feet along the inside of the boundary lines of each lot of this subdivision, which easement shall be for present and future utility purposes, including sewage, water and drainage, and which easements shall be for the benefit of the future owners of this subdivision; and as an incident to the reservation of these easements, the right to construct, install, lay and maintain the necessary pipe, lines, pipelines, poles, drains and tile to carry out the purposes of this reservation is hereby expressly reserved.
>
> The roads and rights of way constructed and to be constructed by the Grantors shall be for the use and benefit of all owners of property whose source of title is derived from the Grantors, and the Grantors shall maintain said roads and rights of way until such time as the Grantors have conveyed four (4) parcels of land in this subdivision. At that time, the owners of the various parcels of land in the subdivision shall organize a property owners' association which shall thence be responsible for the maintenance of said roads and rights of way. Said roads and rights of way shall be kept in good condition for the use and convenience of all such owners, and such owner agrees to contribute equally to the costs of such easement.

(Emphasis added). As evidenced by the emphasized language quoted above, which provision was not included in the majority's decision in this case, the original grantors reserved an express "easement *as necessary*" as to "any roadway or right of way constructed and to be constructed by the Grantors *for the benefit of the subdivision*." (Emphasis added). Because Mr. Kuhn cannot

---

[9]Mr. and Mrs. Shrout were the first owners of Lot 6 when the original owners of the parent tract, *i.e.* the Dolls, originally divided this parcel from their residue, which the Ravenscroft Trust now owns.

11

demonstrate the existence of either of these two prerequisites upon which the express easement he seeks is conditioned, he has not demonstrated the existence of an express easement by virtue of the deed's descriptive language, either.

First,

[a] way of necessity exists where land granted is completely environed by land of the grantor, or partially by his land and the land of strangers. The law implies from these facts that a private right of way over the grantor's lands was granted to the grantee as appurtenant to the estate.

Syl. pt. 1, *Wooldridge v. Coughlin*, 46 W. Va. 345, 33 S.E. 233 (1899), *overruled on other grounds by O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561 (2010). *See also* Syl. pt. 4, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010) ("To establish an easement implied by necessity (which in West Virginia is called a 'way of necessity'), a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the dominant and/or servient estates to another); (3) at the time of the severance, the easement was strictly necessary for the benefit of either the parcel transferred or the parcel retained; and (4) a continuing necessity for an easement."). Here, all of the parties acknowledge that Mr. Kuhn can access Lot 6 of his property by traversing the back right-of-way, which the parties acknowledge exists and which Mr. Kuhn's predecessors used as their exclusive means of ingress to and egress from Lot 6. Merely because another route may be more convenient does not bestow upon the more advantageous path the designation of a way of necessity. *See* Syl. pt. 5, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010) ("'If one has a reasonable outlet over his own property, he cannot exact a more convenient way as of necessity over the premises of another.' Syllabus point 2, *Dorsey v. Dorsey*, 109 W. Va. 111, 153 S.E. 146 (1930)."). Therefore, Mr. Kuhn has not demonstrated that the front right-of-way he seeks is necessary insofar as he has another route by which to access his property, *i.e.* Lot 6.

Moreover, the original deed in Mr. Kuhn's chain of title specifically contemplates that the express easement is granted with respect to "any roadway or right of way constructed and to be constructed by the Grantors *for the benefit of the subdivision*." (Emphasis added). There is no dispute that the Ravenscrofts, who conveyed the residual parent tract to its current owner, the Ravenscroft Trust, received title to this parcel subject to the above-quoted language contained in the deeds for the formerly contemplated subdivision lots, including Lot 6, that were severed from the parent tract. However, the parties also do not dispute that the once contemplated subdivision was never realized; such plans were abandoned when the original grantors declared bankruptcy, and the residue of their real estate was conveyed in satisfaction of their debts. As such, by the time the Ravenscrofts, and later the Trust, acquired this property, this condition that the express

12

easement was granted only in routes constructed "for the benefit of the subdivision" was no longer applicable because the subdivision was never completed. By the same token, Mr. Kuhn has not demonstrated that the Ravenscrofts constructed their driveway "for the benefit of the [nonexistent] subdivision"; rather the sole record evidence on this point shows that the Ravenscrofts constructed their driveway, at their own expense for which they sought no contribution from adjacent landowners, as the exclusive means by which to access *their own residence*, and not as a means of ingress to or egress from the other lots comprising the never realized subdivision. As such, this condition precedent for the operation of the express easement also has not been satisfied.

Finally, Mr. Kuhn attempts to demonstrate the location of the purported front right-of-way by introducing surveys of the subject property that he, himself, commissioned. However, he does not explain how the alleged right-of-way can traverse the same path that is occupied by a well casing that is clearly marked on not one, but two of the surveys he relies upon to establish the alleged easement's location. It stands to reason that if the well casing is still in existence, a vehicle could not drive over it, and, by the same logic, the well casing would not have been marked on the surveys if it was not still in existence. Therefore, Mr. Kuhn's attempt to establish the location of the alleged front right-of-way by extrinsic evidence also fails to identify it with the specificity required of an express easement.

Above all, Mr. Kuhn was required to prove the existence of his alleged easement by clear and convincing evidence: "[t]he burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof." Syl. pt. 1, *Berkeley Dev. Corp. v. Hutzler*, 159 W. Va. 844, 229 S.E.2d 732 (1976), *overruled on other grounds by O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561. Considering his failure to overcome the lack of a definite description of the location of the alleged easement in the language of the deed, itself; to show that the easement he claims to possess satisfies the "as necessary" and "for the benefit of the subdivision" prerequisites to its creation; or to demonstrate the precise location of the purported easement by extrinsic evidence, Mr. Kuhn has not established the existence of the alleged front easement by "clear and convincing proof." *Id.* Therefore, I respectfully dissent from the majority's decision finding to the contrary. I am authorized to state that Justice Walker also joins in this dissent.